770 F.2d 367
 54 USLW 2141, 1985-2 Trade Cases 66,744
 SEABOARD SUPPLY CO., a New Jersey Corporation, and Seaboard
Plastics Corp., a New Jersey Corporation, Appellants,
v.
CONGOLEUM CORPORATION, a Delaware Corporation, Jack Berk,
Manufacturers Reps Company, Inc., a New Jersey
Corporation, and William G. Merrigan,
Sr. and Richard T. Laughlin, Appellees.
 No. 84-5630.
 United States Court of Appeals,
Third Circuit.
 Argued April 29, 1985.
Decided Aug. 16, 1985.
 
 Daniel D. Caldwell (argued), John J. Barry, Wolff & Samson, Roseland, N.J., for appellants.
 Irvin M. Freilich (argued), Joseph J. Fleischman, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J., for appellee Congoleum Corp.
 George R. Hirsch (argued), Peter R. Sarasohn, Bernard Schenkler, Ravin, Sarasohn, Cook, Baumgarten & Fisch, West Orange, N.J., for appellees Manufacturers Reps Co., Inc. and William G. Merrigan, Sr.
 Before SEITZ, WEIS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 The principal issue in this case is whether a scheme of commercial bribery between an employee of a manufacturer and an entity which acted as a sales agent comes within the prohibition of either the Sherman or Robinson-Patman Acts. The district court found essentially that because a legitimate agency relationship existed between the briber and the manufacturer and no sales occurred between the two, the Acts had not been violated. Although the activity was reprehensible and probably violated state civil and criminal law, we agree that the scheme did not come within the scope of the antitrust laws. Accordingly, we will affirm the summary judgment in favor of the defendants.
 
 
 2
 Plaintiff Seaboard is engaged in the wholesale distribution of roofing felt in New Jersey, Eastern Pennsylvania, and Southern New York. Defendant Manufacturers Reps Company (MRC) competed with Seaboard initially as a wholesale distributor and as a commissioned-sales agent for Congoleum Corporation, a felt manufacturer.
 
 
 3
 Before 1975, Seaboard had been Congoleum's only wholesale distributor in the area, and MRC had sold similar products for other manufacturers. In 1975, defendant Jack Berk became a sales manager for Congoleum and set out to increase the volume of felt sales. In the two years that followed, he succeeded in adding four new wholesale distributors, including MRC.
 
 
 4
 When MRC was added, however, Berk made some unusual arrangements. In 1976, he asked defendant William Merrigan, Sr., the president of MRC, for a participation in the company's business. In return Berk promised to make Congoleum felt available. When Merrigan assented, he and Berk executed a "consulting agreement," which was prepared by defendant Richard Laughlin, Congoleum's in-house counsel.
 
 
 5
 The agreement provided that MRC would pay Berk $300 per week with a stock participation option in return for "consulting services." As time went on, Berk increased his demands for compensation and fringe benefits. The total payments amounted to $110,637.30, and were augmented by a life insurance policy, leased automobiles, and improvements to Berk's residence. Merrigan did not expect that Berk would actually provide any consulting services.
 
 
 6
 When MRC was first being considered as a distributor, Congoleum's credit manager investigated MRC's financial profile and allowed only a $25,000 credit line. That limit posed problems because anticipated business volume exceeded the allowance. To overcome the financing restrictions, Berk suggested, and the credit manager recommended, that MRC become a commissioned sales agent for Congoleum.
 
 
 7
 Under this arrangement, MRC neither received title to the products, nor assumed any of the credit risks. Congoleum prepared the bills and invoices and delivered truckload quantities directly to the customer. MRC's customers were charged five percent over the price at which distributors, including Seaboard, were charged. This five percent differential was paid by Congoleum to MRC as a commission. By contrast, Seaboard and the other distributors bore the entire credit risk and did the billing for all sales to their customers.
 
 
 8
 After Berk entered into his "consulting agreement" with MRC, Seaboard's long-standing relationship with Congoleum deteriorated. Seaboard's orders were not filled promptly, and its sales of Congoleum felt declined precipitously. As many as thirty of Seaboard's customers transferred their business to MRC. One explanation for this shift was that Berk could cause an order to be cancelled or delayed and could steer customers to another distributor or agent.
 
 
 9
 By late summer or early fall of 1979, MRC wearied of Berk's escalating demands and discontinued its payments to him. Berk thereupon entered into a new "consulting agreement" with Plymouth Asphalt and MRC's felt business began to collapse. Shortly thereafter, Merrigan's son told Congoleum's management about the payoffs. Congoleum acted promptly and terminated both Berk and Laughlin. Berk was later indicted in a New Jersey state court for embezzlement and theft by deception.
 
 
 10
 Seaboard brought this suit against Congoleum, Berk, and MRC alleging violations of section 1 of the Sherman Act, sections 2(a), (c), (e), and (f) of the Robinson-Patman Act, and section 3 of the New Jersey Antitrust Act. The complaint also included counts for tortious interference with contractual relationships and prospective economic advantage. Laughlin was charged with fraudulent concealment.
 
 
 11
 After extensive discovery, all parties filed motions for summary judgment. The district court prepared a comprehensive opinion, discussing each of the federal counts in detail.
 
 
 12
 Seaboard's contention that section 1 of the Sherman Act had been violated was rejected because the record was insufficient to support the inference that concerted activity by Congoleum and MRC was designed to achieve an "unlawful objective." The facts demonstrated that "Congoleum exercised its independent discretion in making MRC a commissioned sales agent in furtherance of its general marketing strategy to increase sales of its roofing felt product."
 
 
 13
 Although Seaboard had shown a significant sales decline, intrabrand competition among Congoleum's distributors had increased. Moreover, by using MRC as a commissioned selling agent, Congoleum was able to reduce the price to roofing contractors and compete more effectively with other producers. Thus, interbrand competition was stimulated as well. Consequently, the court concluded that Seaboard had failed to prove either anti-competitive purpose or effect and the Sherman Act count failed.
 
 
 14
 In count 2, Seaboard charged that Congoleum and Berk had violated sections 2(a) and (f) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. Secs. 13(a) and 13(f), by using a sham agency status with MRC in order to give it preferential credit terms and price discounts. The court noted that to establish a violation Seaboard had to prove actual sales to competing purchasers at different prices. Because Congoleum retained title, assumed the credit risks, and controlled the price, the court concluded that MRC was not a purchaser but only a sales agent. The fact that MRC bribed Berk did not convert the transactions into purchases, and hence sections 2(a) and (f) did not apply.
 
 
 15
 In addition, the court concluded that Congoleum did not compromise its credit standards to treat MRC as a favored distributor. Because Seaboard could not demonstrate either price discrimination or anti-competitive effect, the section 2(a) count could not be sustained.[1]
 
 
 16
 Seaboard also alleged that MRC and Merrigan had violated section 2(f) of Robinson-Patman because they solicited and knowingly accepted price discrimination. The court held that a section 2(f) claim is derivative of section 2(a), and since plaintiffs had failed to establish a cause of action against the seller under 2(a), there could be none against a buyer under 2(f). The court cited Great A & P Tea Co., Inc. v. FTC, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979), in which the Supreme Court held that liability under section 2(f) is limited to the situation where a case against a seller under 2(a) can be established.
 
 
 17
 The district court also examined Seaboard's claim that the payments by MRC and Merrigan to Berk and Laughlin violated section 2(c), the brokerage provision of the Robinson-Patman Act.[2] That section prohibits unearned payments to the other party to a transaction or to an agent who is subject to the control of a person other than the one making the payment. After a review of case law and legislative history, the district court concluded that 2(c) "applies only to unlawful payments which pass between sellers and purchasers." Because MRC was an agent of Congoleum and not a purchaser, the payments made to Berk did not violate 2(c).
 
 
 18
 Finally, Seaboard alleged that section 2(e) was violated by Berk's actions in providing preferential promotion and delivery services to MRC. That count was also found to be deficient because section 2(e) applies only to purchasers. Since MRC did not fall in that category, no violation had occurred.
 
 
 19
 Having determined that summary judgment should be entered on the federal claims and that no diversity jurisdiction existed, the court dismissed the pendent state claims. Seaboard has appealed from each of the court's rulings on the federal claims.
 
 THE ROBINSON-PATMAN CLAIMS
 
 20
 Seaboard's first contention is that the proscriptions of section 2(c) are absolute and establish a per se rule for commercial bribery of the sort presented here. Seaboard asserts that 2(c) is not limited to "dummy" brokerage schemes but reaches other practices such as the bribing of a seller's broker by the buyer.
 
 
 21
 According to the terms of section 2(c), it is unlawful for any person to either pay or receive--
 
 
 22
 (1) anything of value as a commission, brokerage, or other compensation, or
 
 
 23
 (2) any allowance or discount in lieu of brokerage, except for services rendered in connection with a sale or purchase of goods, when the payment is made
 
 
 24
 (3) to the other party to the transaction, or
 
 
 25
 (4) to an agent, representative or other intermediary where the intermediary
 
 
 26
 (a) is acting for or in behalf, or
 
 
 27
 (b) is subject to the direct or indirect control, of any party to the transaction other than the person by whom the compensation is paid.
 
 
 28
 This section was enacted as part of the Robinson-Patman Act in 1936 to curb abuses by large chain store buyers who used "dummy" brokerage fees as a means of securing price rebates. The large stores required the sellers to pay a "brokerage" to persons employed by the buyers. These persons had rendered no service, and would simply pay over the commissions to their employers.
 
 
 29
 Although this practice was the chief target of section 2(c), it was not the only way in which the brokerage process was used to effect price discrimination.[3] To prohibit such practices Congress used broad language to cover not only the methods then in existence but others that might be devised. See FTC v. Henry Broch & Co., 363 U.S. 166, 169, 1160, 4 L.Ed.2d 1124, 80 S.Ct. 1158 (1960); FTC v. Simplicity Pattern Co., Inc., 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959). The statutory text has been criticized however--"Section 2(c) is undoubtedly the most ambiguous and faultily drafted section of the Act." C. Austin, Price Discrimination, 106 (1959).
 
 
 30
 The expansive language of the section has led some courts to apply its proscriptions to commercial bribery even though no actual antitrust interests are present. In Grace v. E.J. Kozin Co., 538 F.2d 170 (7th Cir.1976), the court allowed recovery under 2(c) where an agent in violation of his fiduciary duty received commissions from another on the sale of goods to his employer. Section 2(c) was also successfully invoked by a competitor against a seller who bribed a state purchasing official. Rangen, Inc. v. Sterling Nelson & Sons, Inc., 351 F.2d 851 (9th Cir.1965). Similarly in Fitch v. Kentucky-Tennessee Light & Power Co., 136 F.2d 12 (6th Cir.1943), section 2(c) was applied where the seller paid bribes to the president of the purchasing company for his personal use.
 
 
 31
 There is good reason to question whether Congress intended to sweep commercial bribery within the ambit of section 2(c). As one commentator expressed it, the cited cases "are simple cases of commercial bribery--a competitive wrong in and of itself--thus they need no antitrust crutch for condemnation." He illustrated commercial bribery's uncomfortable situs within Robinson-Patman: "If a kickback or bribe were outside the pale only by virtue of its discriminatory thrust, then its taint could be removed if the bribe were made available to all takers on 'proportionately equal terms.' " 2 L. Altman, Callmann Unfair Comp. Trademarks & Monopolies, Sec. 12.01-02 (4th ed).
 
 
 32
 Unquestionably, commercial bribery is an indefensible practice needing no further condemnation by this court--statutory and common law remedies do exist. The question before us is not whether the conduct here was good or evil--or whether it was legal or illegal. The issue is whether the wrongful activity comes within the scope of Robinson-Patman.
 
 
 33
 The cautionary note we sounded in Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440 (3d Cir.1978), is appropriate here. "Conduct not within the scope of the Act is not made into an antitrust violation by accompanying conduct which is reprehensible under some moral or ethical standard or even illegal under some other law." Id. at 447. "[T]he Sherman Act may not be extended beyond its intended scope and used to police the morals of the marketplace." Id. at 448. See also Parmelee Transp. Co. v. Keeshin, 292 F.2d 794, 804 (7th Cir.1961) ("The antitrust laws were never meant to be a panacea for all wrongs."). "It is, of course, immaterial that the appeal of treble damages and attorneys' fees afforded by federal law may be more attractive than the simple compensatory damages available under state law." Norville v. Globe Oil & Refining Co., 303 F.2d 281, 283 (7th Cir.1962).
 
 
 34
 Nevertheless, we are not inclined to take issue with three Courts of Appeals which found that certain events constituting commercial bribery came within the terms of 2(c). See Grace, 538 F.2d 170 (7th Cir.1976); Rangen, 351 F.2d 851 (9th Cir.1965); Fitch, 136 F.2d 12 (6th Cir.1943). These decisions, the oldest of which dates back to 1943, have been generally accepted and are supported by the statutory language. We are not convinced, however, that the scope of 2(c) covers the conduct here.
 
 
 35
 In the appellate decisions which have found commercial bribery within the ambit of section 2(c) the common thread has been the passing of illegal payments from seller to buyer or vice versa. Adherence to the requirement that payments cross this seller-buyer line is consistent with the interpretation of 2(c) in nonbribery cases. For example, in Cornwell Quality Tools Co. v. C.T.S. Co., 446 F.2d 825 (9th Cir.1971), the court affirmed a directed verdict for the defendant manufacturer where persons receiving unearned commissions from the manufacturer were not under the control of purchasers or acting on their behalf. See also Burch v. Goodyear Tire & Rubber Co., 420 F.Supp. 82 (D.Md.1976), aff'd, 554 F.2d 633 (4th Cir.1977).
 
 
 36
 As the district court in the case at hand observed, Congress intended that legitimate brokerage relationships not be affected. But if a broker receives payments from a party for whom the broker has performed no services, then the payments are simply a sham for unlawful price discrimination. See 5 Von Kalinowski, Antitrust Law & Trade Regulation Sec. 33.01 at 33-9 to 11.
 
 
 37
 From this general intent, the courts have found liability under 2(c) when the seller-buyer line has been passed--but not otherwise. Here, that line has not been crossed. MRC, a sales agent of the seller Congoleum, bribed Berk, the seller's employee. MRC was not a purchaser, and consequently, the statutory requisites have not been met.
 
 
 38
 As an alternative, Seaboard argues that the agency relationship between MRC and Congoleum was a sham and that we should consider MRC a purchaser.
 
 
 39
 It is true that Berk suggested the use of the commissioned-sales agency arrangement when it became apparent that MRC did not have the financial strength to be an independent distributor for Congoleum. Had this alternate arrangement not been used, Berk's ability to carry out his scheme was doubtful. Nevertheless, the record demonstrates that the commissioned-sales agency was legitimate. See Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025 (2d Cir.1979); Katinsky v. Radio Shack, 524 F.Supp. 807 (D.N.J.1980).
 
 
 40
 When MRC arranged for sales of felt, the orders solicited required approval from Congoleum before acceptance. Congoleum also conducted an independent credit check on each customer and took the entire credit risk. Title passed from Congoleum to the customer. Congoleum shipped the goods directly and assumed the risk of loss in transit. Billing was performed by Congoleum, and payments were made to it by the customer. Finally, Congoleum set the price at which the goods were sold.
 
 
 41
 Seaboard's situation was substantially different. It acquired title to the goods, set the price, and assumed the costs and risks of extending credit to the customers. See Western Fruit Growers Sales Co. v. FTC, 322 F.2d 67 (9th Cir.1963).
 
 
 42
 Although the commission agency arrangement facilitated Berk's scheme, that taint did not change the legal relationship between MRC and Congoleum. Seaboard did not present sufficient evidence in support of its sham theory to raise a factual dispute about the realities of the transactions between the parties. On the record, we find no error in the district court's holding that MRC was not a purchaser. In sum, we agree with the district court's analysis of the circumstances which led to a finding that 2(c) had not been violated.
 
 
 43
 Seaboard also presented claims under sections 2(a), (e), & (f) of the Robinson-Patman Act, contending that Congoleum extended preferential treatment and a number of promotional services to MRC. Recognizing that all three subsections of the Act require that the preferences be extended to buyers, Seaboard argues that in reality MRC received the goods in that capacity.
 
 
 44
 Preferences granted to a legitimate sales agent are not actionable because there is no sale to the agent. See United States v. GTE, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926) (distinction between agency relationship and sales contract); Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 119 (3d Cir.1980) (Act requires at least two completed sales by the same seller at different prices to different purchasers). Accord, FTC v. Curtis Publishing Co., 260 U.S. 568, 43 S.Ct. 210, 67 L.Ed. 408 (1923) (agency relationship does not violate Sec. 3 of Clayton Act). See also 4 Von Kalinowski, Sec. 24.03; ABA, Antitrust Law Developments (Second) 223-24 (1984). To succeed in these counts, therefore, it was necessary for Seaboard to show that the sales agency status was merely pretextual and in reality MRC was a competing distributor.
 
 
 45
 We have earlier concluded that the district court did not err in determining that the sales agency relationship was observed by both Congoleum and MRC. In the face of that ruling, an adverse decision to Seaboard on the section 2(a), (e), and (f) claims necessarily follows.
 
 THE SECTION 1 CLAIM
 
 46
 Seaboard contends that the scheme engineered by Berk amounted to a group boycott under the Sherman Act for which defendants were liable under either a per se or a rule of reason analysis. Defendants argue that the decision to employ MRC was not concerted action but was rather unilateral action by Congoleum. In any event, defendants contend that the allegations did not describe a per se offense and that Seaboard failed to prove any anti-competitive effect.
 
 
 47
 The district court concluded that Congoleum's actions were not intended to exclude distributor competition or fix prices but were implemented to further the business interests of the parties. That the arrangement adversely affected Seaboard's business was insufficient to prove an unlawful intent to restrain trade. Having found no per se violation, the court also said that Seaboard failed to show an anti-competitive effect in the relevant product and geographic market.
 
 
 48
 The unilateral decision of a single manufacturer to rearrange its distribution structure by limiting or increasing the number of its dealers or transferring its business to different dealers does not violate the Sherman Act. Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093 (3d Cir.1972). In Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir.1979), however, we held that if the manufacturer's decision was the result of pressure from a retailer-competitor of the plaintiff, the restraint was horizontal and a per se violation.
 
 
 49
 In Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), the Supreme Court discussed the plaintiff's burden of proof to show that a manufacturer's conduct was not unilateral. "There must be evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently." The Court quoted with approval Judge Aldisert's opinion in Edward J. Sweeney & Sons, "The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " At ----, 104 S.Ct. at 1471.
 
 
 50
 Here, the district court's review of the record revealed that Berk had opened several new accounts with wholesale distributors to sell roofing felt. When it could not meet Congoleum's credit requirements, MRC was given the position of a sales agent. Such arrangements had been used by MRC when it acted as a representative for other roofing product manufacturers, and Congoleum had implemented similar relationships in other divisions of the company.
 
 
 51
 Seaboard also contends that defendants conspired to boycott. The decisional law, however, does not support that position. As we said in Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Constr. Trades Council, 670 F.2d 421, 430 (3d Cir.1982), this court "is among those that have attempted to limit the application of the per se rule to the 'classic' boycott." In commenting on this reference and consistent with Cernuto, in Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co., 734 F.2d 133, 142 (3d Cir.1984), we said, "[A] boycott is made out where there is concerted action with 'a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both.' "
 
 
 52
 In Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., --- U.S. ----, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Court cautioned against an overly expansive application of the per se rule in the context of concerted refusals to deal. In that case, the plaintiff charged that its expulsion from a purchasing cooperative was a group boycott that limited the opportunity to compete. The Court found that a per se rule was not appropriate in the circumstances.
 
 
 53
 In reviewing cases where the per se rule was applied, the Supreme Court noted that in those instances the boycotts "often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, [citations omitted] and frequently the boycotting firms possessed a dominant position in the relevant market." Id. at ----, 105 S.Ct. at 2619. The Court also observed that if a concerted refusal to deal on equal terms is alleged, per se invalidation might be in order "if it placed a competing firm at a severe competitive disadvantage." Id. at ---- n. 6, 105 S.Ct. at 2620 n. 6. The record does not demonstrate any such scenario in the case at hand.
 
 
 54
 In Northwest Power Products, Inc. v. Omark Indus., Inc., 576 F.2d 83 (5th Cir.1978), the Court of Appeals refused to apply the per se rule when the plaintiff was replaced by a new distributor. The plaintiff alleged that it had been stripped of its position as the result of a conspiracy between the manufacturer and the new distributor. The scheme was to take away the plaintiff's customers by hiring a contingent of its employees, together with a customer list. The new distributor gained 11.5 percent of the local market while the plaintiff's share plummeted to 2 percent. The court held that even though unfair means may have been used, the antitrust laws did not prohibit the manufacturer from replacing its distributor. See also Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc., 691 F.2d 241 (6th Cir.1982).
 
 
 55
 Moreover, that a manufacturer may give preferential pricing and delivery terms to one distributor does not establish a per se violation of the section 1 of the Sherman Act even though other distributors suffer losses in sales. USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 512 (7th Cir.1982). See Contractor Utility Sales Co., Inc. v. Certain-Teed Products Corp., 638 F.2d 1061, 1073 (7th Cir.1981). Northwest Power Products, Inc. v. Omark Indus., Inc., 576 F.2d 83 (5th Cir.1978). Accord, O. Hommel Co. v. Ferro Corp., 659 F.2d 340, 346 (3d Cir.1981) (Section 2(c) of Robinson-Patman).
 
 
 56
 We conclude that the district court did not err in determining that there was no per se violation. We note however that Seaboard did not advance the per se argument in the district court but contended that a rule of reason approach should be used. We have reviewed the district court's finding on the per se issue only because it addressed the question, and on appeal Seaboard argued that the ruling was erroneous.
 
 
 57
 The district court also found that Seaboard had failed to present evidence which would establish anti-competitive effect and therefore could not prevail on a rule of reason analysis. Plaintiff produced evidence only of its own decrease in sales of Congoleum products. The defendants' evidence showed, however, that intrabrand competition increased and, by using a sales agent, Congoleum was able to reduce its market prices and compete more effectively with other manufacturers. In this situation we must not overlook the Supreme Court's admonition in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), "The antitrust laws, however, were enacted for 'the protection of competition, not competitors.' " We noted earlier the absence of evidence tending to show an anti-competitive effect. On this record, the district court did not err in finding that plaintiff had failed to present a rule of reason claim under section 1 of the Sherman Act.[4]
 
 
 58
 In sum, we find no error in the district court's holdings. Accordingly, the summary judgment in favor of the defendants will be affirmed.
 
 
 
 [1]
 That section reads in pertinent part:
 "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, ...."
 15 U.S.C. Sec. 13(a) (1982).
 
 
 [2]
 That section reads:
 "(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."
 15 U.S.C. Sec. 13(c) (1982).
 
 
 [3]
 Although the purpose of that section was to eliminate unfair price discrimination, existence of that factor is not a prerequisite to liability. In FTC v. Henry Broch & Co., 363 U.S. 166, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960), the Supreme Court held that section 2(c) was independent of 2(a). Hence the presence of anti-competitive effect is not necessary to prove a violation of section 2(c). Id. at 170-71, 80 S.Ct. at 1161-62. See also Great A. & P. Tea Co. v. FTC, 106 F.2d 667 (3d Cir.1939)
 
 
 [4]
 Plaintiff contends that the district court erred in finding that Berk's actions in diverting customers away from Seaboard were not attributable to Congoleum. Even if plaintiff is correct on this point, diversion of customers does not amount to a per se violation and no rule of reason claim has been established. See Northwest Products, 576 F.2d at 90