**MIDLAND EXPORT, LTD., Plaintiff,**

v.

**ELKEM HOLDING, INC., Ferro Invest II, Inc., and Elkem Metals Company, L.P., Defendants.**

Civil Action No. 96–4506.

United States District Court, E.D. Pennsylvania.

Nov. 18, 1996.

Kenneth A. Votre, Votre & Aronson, P.C., New Haven, CT, Peter J. Mooney, White & Williams, Philadelphia, PA, for Plaintiff.

Robert A. Prentice, Eckert Seamans Cherin & Mellott, Philadelphia, PA, Dale Hershey, Mary K. Austin, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, for Defendants.

### MEMORANDUM

JOYNER, District Judge.

Plaintiff Midland Export, Ltd. ("Midland") instituted this action under the Clayton Antitrust Act of 1914, 15 U.S.C. § 12 *et seq.* (1990 & Supp.1996), seeking treble damages and injunctive relief for two alleged violations of the Sherman Antitrust Act of 1890, 15 U.S.C.

§ 1 *et seq.* (1990 & Supp.1996). Midland also asserts several pendent state law claims. Before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint in its entirety for failure to state a claim and for lack of subject matter jurisdiction. Because Midland lacks the standing necessary to assert its federal antitrust claims, the motion is granted.

## BACKGROUND

Plaintiff Midland and Defendant Elkem Holding, Inc. ("Elkem Holding") are both Pennsylvania corporations. Defendant Elkem Metals Company, L.P. ("Elkem Metals") is a New York limited partnership with one general partner, Defendant Ferro Invest II, Inc. ("Ferro Invest"), and two limited partners, neither of which is a party to this action.

We take the following facts alleged by Midland to be true for purposes of the instant motion. Midland imports and exports ferroalloys including silicon metal and ferrosilicon and sells these products to purchasers in the United States. Among the products sold by Midland is silicon metal imported from China. Defendants are domestic producers, importer/exporters, marketers and distributors of ferroalloys including silicon metal and ferrosilicon, and direct competitors of Midland.

Sometime prior to 1991, Defendants and six additional petitioners instituted with the International Trade Administration of the U.S. Department of Commerce ("ITA") and the International Trade Commission ("ITC") a proceeding under the Tariff Act of 1930, 19 U.S.C. § 1671 *et seq.* (1990), commonly known as an "Anti–Dumping Proceeding." Defendants and their co-petitioners charged that the sale of silicon metal imported from China at less than fair market value was causing a "material injury" to the domestic silicon metal industry. After investigating the claims, the ITC agreed and imposed duties and tariffs on silicon metal imported

from China in excess of one hundred (100) percent. The imposition of these duties caused Midland to suffer significant monetary losses, lost future profits, and impaired business relationships with third party purchasers and consumers.

Midland alleges in this action, however, that the duties imposed and the economic harm to Midland that ensued were the result of a conspiracy undertaken by Defendants. According to Midland, Defendants and certain other companies, which together account for essentially the entire domestic market for ferroalloy products,[1] engaged in a price fixing scheme from 1989 to 1992 that artificially inflated the price of silicon metal. Defendants' scheme resulted in reduced demand for their products and increased market share for the Chinese imports sold by Midland and others. Defendants then instituted the Anti–Dumping Proceeding, claiming that the reduced demand for domestic silicon metal was the result of dumping of imports from China and using market data that had been distorted by their price fixing conspiracy. On the basis of the information manipulated by Defendants' anticompetitive practices, the ITC made its "material injury" determination and imposed the tariffs that caused, and continues to cause, Midland "irreparable and immeasurable injury and damage to [its] business and property." Compl. at ¶ 15. Had Defendants' price fixing been disclosed, according to Midland, "the ITC would likely have determined that there was no material injury caused in any way by imports" and would never have imposed the duties that have caused Midland such grievous harm. Pl.'s Mem. in Opp. to Mot. to Dismiss at 13.

In short, Midland alleges that Defendants "deliberately engaged in price fixing with the purpose of causing antidumping duties to be imposed on Plaintiff." Defs.' Reply at 4. These duties enabled Defendants to eliminate competition from Midland in the silicon metal market and consolidate their monopoly in the industry. Based on this alleged conspiracy,

---

1. Midland alleges that
   [t]he largest enterprises engaged in the sale, production, importation and exportation of ferroalloys, including silicon metals, through interstate commerce in and throughout the

United States are the Defendants and their affiliated corporations.... whether size is measured by volume of sales or corporate assets. Compl. at Count II, ¶ 8.

Midland asserts two violations of the Sherman Antitrust Act of 1890 and several causes of action under Pennsylvania, New York and West Virginia law. Defendants now move this Court to dismiss Midland's complaint pursuant to Fed.R.Civ.P. 12 for failure to state a claim and for want of subject matter jurisdiction.

## DISCUSSION

### 1. Standard for Motion to Dismiss

In considering this Rule 12(b)(6) motion, we primarily consider the allegations contained in the complaint, although we may also take into account matters of public record, orders, items appearing in the record of the case and exhibits attached to the complaint. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). We must accept as true all of the allegations in the pleadings and must give Midland the benefit of every favorable inference that can be drawn from those allegations. *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991); *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990). We may properly dismiss the complaint only if it appears certain that Midland cannot prove any set of facts in support of its claim which would entitle it to relief. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

### 2. Midland's Standing to Maintain this Action

Defendants raise numerous bases on which this suit might be dismissed, but we need

only address one to grant the relief they seek. Defendants argue that Midland lacks standing to bring this action because the injury it alleges does not flow directly from the alleged price fixing. Instead, Defendants contend, "[a]ny injury suffered by [Midland] directly resulted from the ruling of and the antidumping duties imposed by the [ITC]." Defs.' Reply Br. at 5. Midland rejoins that its "loss of business expectancy is directly attributable to defendant's [sic] anticompetitive acts" because Defendants either knew or reasonably should have known that the ITC would impose antidumping duties in reliance on the market data distorted by Defendants' price fixing conspiracy. Pl.'s Resp.Br. at 15–17. Before we address these arguments, we must first articulate the applicable legal standards.

Though § 4 of the Clayton Act provides a treble damage remedy to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15 (1990), the Supreme Court has held that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 962 (3d Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). The Court has thus recognized the doctrine of "antitrust standing" as one important limitation on the broad language of the Clayton Act. *Id.* at 964–65.[2] Under this doctrine, courts are required to make a threshold determination that the

---

**2.** Another judicially created limitation on § 4 is the distinct question of "antitrust injury," which a plaintiff must also allege to survive a motion to dismiss. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *In Re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1166 (3d Cir.1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994). As the Court held in *Brunswick,*

Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive

acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.'

429 U.S. at 489, 97 S.Ct. at 697 (citation omitted) (emphasis in original). Though this concept is very closely related to standing, and the antitrust injury analysis is largely subsumed within the standing analysis, our Court of Appeals has noted that "antitrust injury is more than a component to be factored in a standing analysis, it must be present in every case." *In Re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d at 1166. We note this distinction to make clear that, while Defendants argue for dismissal on both injury and standing grounds, our decision rests on Midland's lack of standing.

plaintiff is a "proper party to bring a private antitrust action." *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 907 n. 31, 74 L.Ed.2d 723 (1983); *In Re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1169 (3d Cir.1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994) ("*Iron Ore*"); *Alberta Gas Chemicals v. E.I. DuPont de Nemours,* 826 F.2d 1235, 1239 (3d Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). As our Court of Appeals has explained, "[t]hrough this concept of 'antitrust standing,' the Court has engrafted on section 4 an analysis akin to 'proximate cause' to determine whether a particular injury is too far removed from an alleged violation to warrant a section 4 remedy." *Merican, Inc.,* 713 F.2d at 964 (internal citation omitted); *see also Associated General Contractors,* 459 U.S. at 535–36, 103 S.Ct. at 907–08; *Gulfstream III Associates v. Gulfstream Aerospace,* 995 F.2d 425, 429–30 (3d Cir.1993).

The Supreme Court has declined to fashion a black-letter rule for determining standing in every case, holding instead that "the infinite variety of claims" must be analyzed on a case-by-case basis in light of several factors. *Associated General Contractors,* 459 U.S. at 536–38, 103 S.Ct. at 907–09; *see also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476–478, 102 S.Ct. 2540, 2546–48, 73 L.Ed.2d 149 (1982). The Third Circuit has summarized the factors to be considered "in determining if the plaintiff has suffered an injury which bears a causal relation to an alleged antitrust violation," *Iron Ore,* 998 F.2d at 1165, as follows:

(1) the causal connection between the antitrust violation and the harm to the plaintiff (including whether the defendant intended to cause that harm); (2) whether the 'nature' of the plaintiff's alleged injury is 'of the type that the antitrust laws were intended to forestall,'; (3) the directness or indirectness of the asserted injury; (4) the

existence of more direct victims of the alleged injury (i.e. whether the plaintiff is the party most likely to seek redress of the antitrust violation); and (5) the potential for duplicative recovery or complex apportionment of damages.

*McCarthy v. Recordex Service, Inc.,* 80 F.3d 842, 850 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 86, 136 L.Ed.2d 42 (1996) (internal citations to *Associated General Contractors* omitted). These factors must be "weighed and balanced," and though the Court has assigned no specific weight to the factors, "individually, collectively or relatively," the Third Circuit has described the directness factor as "all-important." *Iron Ore,* 998 F.2d at 1166–68.

■ The balance of factors here leads us to conclude that Midland lacks the requisite standing to maintain this action. First, the causation and directness factors, which we will analyze together as the Third Circuit did in *Iron Ore,* 998 F.2d at 1167–68, cut heavily against Midland given the attenuated causal connection between the anticompetitive practices alleged and the harm that ultimately befell Midland. *See Mid–West Paper Products Co. v. Continental Group,* 596 F.2d 573 (3d Cir.1979) (holding that antitrust plaintiff lacked standing due, in part, to tenuous link between defendants' price fixing and plaintiff's injury). Midland suffered economic loss because the ITC imposed a tariff on silicon metal imported from China after its independent determination that this measure was necessary to prevent further material injury to the domestic market. Even though the ITC reached this conclusion allegedly in reliance on market information distorted by Defendants' conspiracy (taking all of Midland's allegations as true, as we must), the ITC's action was still the direct cause of the harm alleged here. Defendants' conspiracy, even if a significant influence on the ITC's determination, was nonetheless an indirect cause of Midland's harm. Thus, the causation and "all-important" directness factors weigh strongly against Midland's standing to sue.[3]

---

**3.** While Midland repeatedly alleges that Defendants intended the harm that resulted from the imposition of duties by the ITC, "an allegation of improper motive, although it may support a

plaintiff's damages claim under § 4, is not a panacea that will enable any complaint to withstand a motion to dismiss." *Associated General Contractors,* 459 U.S. at 537, 103 S.Ct. at 908;

See *Alberta Gas Chemicals,* 826 F.2d at 1240 ("The statutory sanctions do not constitute a broad restitutionary scheme for injuries not closely related to the violation but caused by other effects, desirable or not, of the illegal conduct."); *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 372 (3d Cir.1985).

The remaining factors do not tilt the balance in Midland's favor. The nature of the asserted injury is "of the type the antitrust laws were intended to forestall" in the general sense that Defendants' alleged conspiracy restrained "the economic freedom of [a] participan[t] in the relevant market." *Associated General Contractors,* 459 U.S. at 538, 103 S.Ct. at 908; *see Acme Markets, Inc. v. Wharton Hardware and Supply Corp.,* 890 F.Supp. 1230, 1236 (D.N.J.1995) ("courts generally find that competitors and consumers are proper parties because antitrust laws are intended to protect 'the economic freedom of participants in the relevant market' ") (citation omitted). Causing antidumping duties to be imposed on a competitor is not, however, the "type of loss that the claimed violations ... would be likely to cause." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *see also Gulfstream III Associates,* 995 F.2d at 429 ("[w]hether a plaintiff is the 'proper party' involves considerations such as *foreseeability* and proximate cause") (emphasis added) (citation omitted). We cannot say that market distortion resulting from price fixing would likely result in the wrongful imposition of antidumping duties by the ITC given the ITC's expertise and independent decision-making process.[4] Further, the harm likely to be caused by the alleged price fixing conspiracy is inflated prices. The most direct victim of the alleged price fixing—*Associated General Contractors* factor 4—is therefore not Midland, a competitor whose business was injured by antidumping duties imposed on the basis of distorted mar-

ket information, but the purchaser who paid too much for silicon metal products as a result of the conspiracy.

While neither side points to a case presenting a similar factual context in which standing was either upheld or rejected, we find support for our decision in the rationale underlying the well-settled "indirect purchaser" rule. This rule, announced by the Supreme Court in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 744, 97 S.Ct. 2061, 2073, 52 L.Ed.2d 707 (1977), bars "downstream indirect purchasers from bringing an antitrust claim" against an alleged monopolist. *McCarthy,* 80 F.3d at 848. Our Court of Appeals recently explained the rationale for the rule as follows:

> Recognizing that allowing an indirect purchaser to assert an antitrust claim for the portion of an overcharge 'passed on' to the indirect purchaser would create an intractable problem of tracing and apportioning damages between different purchasers in the chain of distribution, the Court chose to avoid this morass by enunciating a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action.

*Id.* (citation omitted); *see also Kansas v. Utilicorp United, Inc.,* 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (refusing to make exception where full cost of product, hence one hundred percent of any overcharge, was passed on to indirect purchaser).

The policy behind the indirect purchaser rule informs our judgment in this case because here, too, an apportionment morass would result from permitting recovery on an indirect theory of causation. Midland alleges that Defendants were among nine petitioners who initiated the Anti–Dumping Proceeding that resulted in the imposition of the duties at issue here. Defendants can be said to have "caused" the ITC's determination only to the extent that their alleged price fixing

---

*see also Blue Shield,* 457 U.S. at 479, 102 S.Ct. at 2548 ("The availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the conspirators.").

4. While we agree with Defendants that the economic premise of Midland's theory—that inflated

domestic prices would make the ITC more likely to conclude that the imported products were causing material injury to the domestic market—is not unassailable, we are required here to give Midland the benefit of every favorable inference that can be drawn from its allegations. We therefore accept this premise as valid for purposes of deciding this motion.

168

and the information they supplied actually influenced the ITC's decision. The statute, 19 U.S.C. § 1671 *et seq.*, and federal regulations, 19 C.F.R. § 201 *et seq.*, that define the standards and procedures employed in the Anti–Dumping Proceeding make clear, however, that the ITC considers numerous factors in deciding whether or not to impose an anti-dumping duty in a given situation and in what amount.[5] Some of these factors, such as the "estimate of foreign market value" of the goods in question, *see* 19 C.F.R. § 353.42(a), have nothing to do with the alleged price fixing conspiracy or any market distortion that would result. Thus, determining the degree to which the ITC actually relied on information unrelated to the alleged conspiracy would inevitably be a highly speculative inquiry, impossible to resolve with any degree of certainty. *See Associated General Contractors,* 459 U.S. at 543, 103 S.Ct. at 911 ("it is appropriate for § 4 purposes 'to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm'") (citation omitted); *Motor Carriers Labor Adv. Coun. v. Trucking Mgt.,* 711 F.Supp. 216, 230 (E.D.Pa.1989) (holding that one class of plaintiffs lacked standing where damage theory was "speculative, abstract, and impractical"). Thus, the fifth and final *Associated General Contractors* factor—the potential for duplicative recovery or complex apportionment of damages—also militates strongly in favor of dismissal.

We therefore hold, based on the balance of factors in this case, that Midland lacks the requisite antitrust standing to maintain this action. We need not reach Defendants' remaining contentions to conclude that Midland's antitrust claims must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).[6] Because Midland and Elkem Holding are non-diverse parties, we dismiss the pendent state law claims for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). An appropriate Order follows.

### ORDER

AND NOW, this 18th day of November, 1996, upon consideration of Defendants' Motion to Dismiss the Complaint Pursuant to Rules 12(b)(1) and 12(b)(6), Plaintiff's Response, and Defendants' Reply thereto, it is hereby ORDERED that the Motion is GRANTED and the Complaint is DISMISSED in its entirety.

---

5. As we note *supra,* we may consider these matters of public record in deciding this motion to dismiss. *Pension Benefit Guar. Corp.,* 998 F.2d at 1196.

6. We note in passing that, were outright dismissal of this action not warranted, the doctrine of primary jurisdiction would have barred our adjudication of Midland's antitrust claims at this point. This doctrine

> requires a court to suspend its process and refer a matter to an administrative body 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of [that] administrative body.'

*F.P. Corp. v. Ken Way Transportation, Inc.,* 848 F.Supp. 1181, 1185 (E.D.Pa.1994) (quoting *United States v. Western Pacific,* 352 U.S. 59, 64–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)). We agree with Defendants that, in accordance with the persuasive reasoning of the courts in *Alberta Gas Chemicals, Ltd. v. Celanese Corp.,* 650 F.2d 9 (2d Cir.1981), and *Outboard Marine Corp. v. Pezetel,* 535 F.Supp. 248 (D.Del.1982), a stay of these proceedings to allow the ITC to consider Midland's claims first would have been appropriate. Midland remains free to pursue the administrative remedies available.