## HUDSON'S BAY COMPANY FUR SALES INCORPORATED, Plaintiff,

v.

## AMERICAN LEGEND COOPERATIVE, Defendant.

### Civ. A. No. 86–2899.

United States District Court, D. New Jersey.

Dec. 19, 1986.

---

**19.** The Committee has withdrawn the first claim by stipulation dated August 11, 1986. *See supra* note 2.

Frederick L. Whitmer, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for plaintiff.

Eric J. Lobenfeld, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Clive S. Cummis and Steven S. Radin Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, Newark, N.J., for defendant.

LECHNER, District Judge.

*Introduction*

Plaintiff, Hudson's Bay Company Fur Sales Incorporated ("Hudson"), instituted this antitrust action against the defendant, American Legend Cooperative ("Legend"), for purported violations of sections one[1] and two[2] of the Sherman Act (the "Act"), as amended, 15 U.S.C. §§ 1 and 2 (Count I), for misuse of trademark and violation of

---

1. 15 U.S.C. § 1 provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

2. 15 U.S.C. § 2 states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

the Lanham Trademark Act, 15 U.S.C. § 1121 (Count II) and for pendent claims of tortious interference with contractual relationships (Count III), tortious interference with prospective economic advantage (Count IV) and breach of contract (Count V).[3]

Hudson and Legend are involved in interstate commerce in the marketing and sale of mink pelts produced by mink ranchers in the United States. In particular, Hudson acts as a marketing agent and broker for mink ranchers. As such it receives, warehouses, displays and conducts auction and private sales of mink pelts. Legend was created in late 1985 when the two major American mink farmer associations, Emba Mink Breeders Association ("EMBA") and Great Lakes Mink Association ("GLMA") unified.[4] EMBA and GLMA own various trademarks used in the marketing of mink pelts and garments. These trademarks, the most important of which is the "Blackglama" mark, were in effect transferred to Legend which polices the use of the trademarks.

Legend, in an effort to promote sales of mink pelts produced by its members, has restricted use of the various EMBA and GLMA trademarks to those mink pelts auctioned through the Seattle Fur Exchange ("SFX"), a subsidiary of Legend. The various trademarks, previously available to a qualified pelt of any member of EMBA or GLMA who sold through an auction house which had a contract with EMBA or GLMA or both, are now available only to pelts auctioned or otherwise sold through SFX.

Hudson claims this restriction violated and continues to violate the antitrust laws.

On July 25, 1986, Hudson filed its verified complaint and an Order to Show Cause requesting, among other forms of relief, a temporary restraining order. Hudson contends: (1) Legend's trademark restriction constitutes an unlawful tying arrangement restraining trade in the American fur auction market, and (2) Legend and others have conspired to monopolize the American mink pelt industry.

Following a hearing and thereafter a denial of the requested temporary restraining order, pre-trial discovery was conducted and completed. By agreement among the parties and the court, the matter was tried on October 8, 9, 14, 15 and 16, 1986. Hudson and Legend submitted written summations on October 23, 1986 and presented oral rebuttals on October 27, 1986. After a review of the Stipulations by the parties, the evidence presented, the proposed findings of facts and conclusions of law, the trial briefs and summations (both written and oral), I find, for the reasons stated below, Hudson has failed to prove that Legend either (1) engaged in a restraint or attempted to restrain trade in violation of section one of the Sherman Act, or (2) monopolized or attempted to monopolize the markets in which it competes in violation of section two of the Sherman Act. Hudson has failed to prove the restriction on the use of the various trademarks (owned by EMBA and GLMA and policed by Legend) constitutes an illegal tying arrangement.[5]

---

**3.** Counts II, III, IV and V were dismissed pursuant to motion, with consent of Hudson, at the end of Hudson's case. However, allegations concerning the use of trademarks remain in the case to the extent the allegations or facts so developed affect the allegations with regard to sections one and/or two of the Sherman Act. (Trans. 10/14 at 50 to 78.)

**4.** The parties have not indicated what is meant by the term "unified;" apparently, the two associations merged in some manner.

**5.** Legend devoted significant efforts in its briefs toward establishing a defense to the alleged antitrust violations under the Capper-Volstead

Act, 7 U.S.C. § 291. The Capper-Volstead Act exempts from antitrust liability certain activities undertaken by "farm cooperatives" which "seek to achieve the lawful aims of the cooperative movement." *Alexander v. National Farmers Organization,* 687 F.2d 1173, 1182 (8th Cir.1982), cert. denied, 461 U.S. 938, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983). Because Hudson has failed to carry its burden in this case of establishing an antitrust violation, it is unnecessary to determine whether, under Capper-Volstead, Legend is a "farm cooperative" and whether its challenged practices are within the scope of Capper-Volstead.

Many of the findings of fact are substantiated with citations to Stipulations, or testimony or documentary evidence or a combination of such authority; such citations are not meant to be exhaustive concerning the finding. Some of these findings are based upon the record or inferences from the record which are not cited. Page or document citations are not set forth to support general findings. *See, e.g., Smithkline Corp. v. Eli Lilly & Co.,* 427 F.Supp. 1089, 1094–1110 (E.D.Pa.1976), *aff'd,* 575 F.2d 1056 (3d Cir.), *cert. denied,* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *United States v. Brown Shoe Co.,* 179 F.Supp. 721 (E.D.Mo.1959), *aff'd,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. International Boxing Club of N.Y.,* 150 F.Supp. 397, 401–419 (S.D.N.Y.1957), *aff'd,* 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959).

This opinion, including the legal discussion, constitutes my Findings of Fact and Conclusions of Law. All proposed findings of fact and conclusions of law inconsistent with those set forth herein are rejected in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## I. *Findings of Fact*

### A. *The Parties and Entities Involved*

1. Hudson is a corporation organized under the laws of New York, with its place of business presently at Carlstadt, New Jersey. [Stipulation 1.]

2. Hudson is a wholly owned subsidiary of the Hudson's Bay Company, a Canadian corporation. The Hudson's Bay Company is a general merchandising corporation, which owns and operates several major department stores, has a major interest in a real estate development organization and in oil and gas interests and had annual revenues during 1985 of approximately U.S. $4 billion. [Stipulations 2 and 3.]

3. Hudson acts as agent and broker for the sale of fur pelts and conducts auction sales of fur pelts. In the course of its business, Hudson, *inter alia,* receives, warehouses, sorts, grades, displays and conducts auction sales (and private sales) of mink pelts. [Stipulation 8.]

4. On October 9, 1985 Legend was incorporated and organized under the laws of Wisconsin, and has its place of business in Seattle, Washington. [Stipulations 14 and 15.] Legend is an association of mink producers engaged in interstate and foreign commerce of its members' mink products. [Trans. 10/14 at 196:12–197:25.]

5. Legend came into being through the unification of EMBA, a corporation, organized under the laws of Wisconsin, with its place of business in Seattle, Washington, and GLMA, a non-stock, not-for-profit corporation, organized under the laws of Wisconsin, with its place of business in Seattle, Washington. Only domestic mink ranchers who sell at least 1200 pelts [6] through an auction house or agency that has a contract with Legend can become voting members of Legend. [Trans. 10/14 at 97:3–11; 98:23–100:13; D–27; Stipulation 16.] Non-voting membership in Legend is available to non-domestic fur producers. [D–27.]

6. SFX is a Washington corporation with its principal place of business in Seattle, Washington and is wholly owned and controlled by Legend. SFX is in the business of collecting and auctioning fur pelts. SFX was privately owned until 1973, when it was acquired by EMBA. [Stipulations 26 and 27.]

7. Hudson and SFX derive their income primarily from a brokerage commission paid by the seller/rancher and a percentage fee paid by the buyer. [Stipulation 54.]

8. SFX competes with Hudson in the business of collecting and auctioning mink pelts and other fur pelts in the United States. For the last several years, only Hudson, SFX and Elbeco Marketing Co., Inc. ("Elbeco") have conducted auctions of mink pelts in the United States.

9. Elbeco is a corporation of the State of New Jersey with its principal place of

---

**6.** The minimum sale requirement of 1200 pelts is not economically significant and accounts for only a very small part of an average rancher's production for a given year.

business in North Bergen, New Jersey. Elbeco is in the business of auctioning fur pelts, including mink pelts. [Stipulation 19.]

10. Amerimink is an association of mink farmers, incorporated under the laws of Washington, with its place of business in Bothell, Washington. [Stipulation 18.]

11. Since 1970 and through the 1986 auction season, Elbeco has been the exclusive agent for the sale of mink pelts produced by the members of Amerimink that are sold under the Amerimink trademark. [Stipulations 20 and 22.]

B. *Unification of EMBA and GLMA*

12. The unification of EMBA and GLMA, which was completed on October 9, 1985 [Stipulation 15], had been a goal of the two associations since at least 1970. Unification was considered desirable because, *inter alia*, it would combine promotional and marketing efforts of the two associations. Despite numerous proposals and many meetings, EMBA and GLMA were unsuccessful in reaching agreement on a unification plan until 1985. [Stipulations 61 and 62.]

13. In early 1984, EMBA engaged Management Design Association ("MDA"), a management consulting firm, to undertake a marketing review and analysis. EMBA was familiar with the work of MDA and MDA's president, Thomas P. Haass ("Haass"), since MDA had been engaged by SFX in 1978 to redesign its information systems. [Stipulations 63 and 64.] MDA was thereafter retained by the EMBA Board of Directors to conduct a management review of SFX and to report its findings to the EMBA Board concerning the quality of SFX management. [Stipulation 65.]

14. When EMBA determined in early 1984 that a general marketing study was appropriate, representatives of EMBA contacted Haass and asked him to conduct a marketing review and prepare an overview of the marketing issues facing EMBA. [Stipulation 66.] Pursuant to this engagement, Haass prepared a paper entitled "EMBA Marketing and Association Review", dated October 10, 1984 (the "Review"). [Stipulation 67; P–1.] Haass presented the Review at a joint meeting of the GLMA and EMBA Boards on October 10, 1984. [Stipulation 69.]

15. The Review recognized the importance of the Blackglama trademark [Stipulation 70], stated that " 'Quality' is the only selling advantage of American produced mink" [Stipulation 71; P–1], suggested unification of EMBA and GLMA [Stipulation 72; P–1] and recommended (1) the unified association be "headed by a full time professional leader"; (2) that "[a] new marketing approach should be designed that positions American mink as the best in the world"; and (3) that "[t]he Association must take a more active role in working with the auction houses." [Stipulation 73; P–1.]

16. Following Haass' presentation of the Review, the Boards of Directors of EMBA and GLMA passed resolutions authorizing Haass to assist in bringing the two associations together and another resolution appointing a Unification Task Force. [Stipulation 74.]

17. A reorganization proposal prepared by the Unification Task Force was first presented to the GLMA and EMBA Boards of Directors for reaction in February, 1985 at a meeting in Chicago, Illinois. That proposal cited as one goal of unification to "make better use of the only three assets the American mink farmer has:—a quality product—the Blackglama trademark [and] —an association owned auction house [SFX]." [Stipulation 76; P–1.] There was concern about the viability of SFX (P–1; P–7; Trans. 10/14 at 137:15–138:11) and also a recognition that SFX was being underutilized as a means of competing with Hudson's auction house. [P–1; P–2.]

18. In September, 1985, an Information Statement describing the proposed unification of EMBA and GLMA was circulated, which advised members that the associations had notified Hudson and SFX of their intention to terminate existing auction

agreements, to merge into Legend, and to enter into new agreements negotiated by Legend with Hudson and SFX.

19. Information was disseminated to the members of GLMA and EMBA to explain the proposal and to advocate its adoption. On May 24, 1985, the Board of Directors of EMBA adopted a resolution approving the Unification Agreement and the execution of such an Agreement on behalf of EMBA. In October, 1985, the Board of Directors of GLMA voted to approve the proposed unification with EMBA. At their annual meetings in October, 1985, the members of both EMBA and GLMA voted to approve the unification of the two associations [Stipulations 77 through 80]; EMBA and GLMA entered into the Agreement and Plan of Unification ("Unification Agreement"), dated as of July 18, 1985. [Stipulation 81.] Haass became Chief Executive Officer of Legend on December 1, 1985. [Stipulation 85.]

C. *Composition and Operating Structure of Legend, EMBA and GLMA*

20. Legend carries out a variety of functions on behalf of its members. Among other activities, Legend: (1) negotiates and enters into marketing agreements for the sale of members' mink pelts; (2) promotes and markets mink pelts produced by members and mink garments produced from members' mink; (3) attends and participates in trade shows and meetings around the world; (4) attends and supervises the sale of members' mink at auction houses; (5) supervises and funds legal activities, and cooperates with EMBA and GLMA to enforce trademark rights; (6) monitors and reports on sales of mink pelts worldwide; (7) distributes newsletters to members; and (8) maintains membership lists and reviews membership requests from non-members. [Trans. 10/14 at 89:17–90:16; 196:12—197:25.]

21. Legend's members are assessed in common for the marketing services provided by Legend. Legend assists in marketing its members' fur products and polices their trademarks. These costs are defrayed by assessment deductions from the sales of its members' mink pelts.

22. Legend's Board of Directors is elected by and is composed of members of Legend who are mink ranchers. [Trans. 10/14 at 98:23–99:12.] No Legend member has more than one vote within the cooperative. [Trans. 10/14 at 99–100.] The Legend by-laws provide for the removal of any or all of the directors at an annual meeting or special meeting which can be called for that purpose by 20% of Legend's voting members. [Stipulation 17.]

23. GLMA and EMBA market the mink products of their members in interstate and foreign commerce.

24. Only domestic mink ranchers can become voting members of EMBA and GLMA. The Board of Directors of GLMA and EMBA is elected by and is composed of members of GLMA and EMBA. No member of GLMA or EMBA has more than one vote within the cooperative. Non-voting membership in GLMA and EMBA is available to non-domestic fur producers.

D. *Trademarks*

25. EMBA and GLMA each own various trademarks used in the marketing and sale of their members' fur pelts. [Stipulations 42, 44.] Ownership of the trademarks remained with EMBA and GLMA following unification. [Stipulation 165.]

26. GLMA owns the Blackglama and GLMA trademarks identifying dark mink of the highest quality produced by its members.[7] [Stipulation 42.] Of the total number of mink pelts produced in the United States approximately one-third are dark mink; of these only about one-third qualify for the Blackglama trademark. [Trans. 10/8 at 103:16–25.]

27. Since 1968, GLMA has expended millions of dollars advertising and promot-

---

**7.** Throughout this opinion reference may be made to the Blackglama trademark since it is the main focus of this action. However, all trademarks now within control of Legend are within the scope of this action.

ing mink pelts and garments under the Blackglama trademark. [Stipulation 40.]

28. As a result of the substantial sales and advertising of mink pelts and garments under the Blackglama trademark, Blackglama has become well and favorably known to the public and trade identifying and distinguishing the source of GLMA's product [Stipulation 39] and identifying ranch mink pelts of the highest quality and darkest color produced by GLMA members. [Stipulations 41–43.]

29. EMBA owns or owned certain trademarks including: Tourmaline, Obsidian, Morning Light, Lutetia, Jasmine, Arcturus, Argenta, Autumn Haze, Azurene, Cerulean, Diadem, Lunaraine, and EMBA. The Autumn Haze and EMBA trademarks have acquired an excellent reputation. [Stipulations 44 and 45.] Autumn Haze, for example, is used only in connection with EMBA's highest grade mutation mink pelts of natural brown color, and distinguishes these pelts as having been graded and selected under the supervision of Legend. [Stipulation 46.]

30. GLMA and EMBA have spent considerable amounts of money promoting and policing their trademarks. [Stipulation 47.] The member ranchers bear the entire cost of promoting the EMBA and GLMA trademarks through an assessment on auction sales of members' pelts. Over the last ten years, the rancher members of EMBA and GLMA have invested three to four million dollars to promote these marks. [Trans. 10/14 at 198:1–8.] Hudson does not pay to promote or advertise the marks owned by GLMA and EMBA. [Trans. 10/8 at 93:6–10.] Legend has budgeted $300,000.00 for advertising in 1986. [Trans. 10/14 at 198:1–8.]

31. Other trademarks, not owned by either EMBA or GLMA, have acquired value in the marketplace and are currently used in conjunction with the sale of both dark and mutation mink pelts at Hudson and at other auction houses. [Stipulation 166.] Other dark mink pelts sold under the trademarks Black Willow, Black Mist, Black Shadow, Black Jewel, and Black Diamond compete with mink pelts sold under the Blackglama trademark. These trademarks are privately owned by individual mink ranchers who sell pelts at Hudson's or at other auction houses. [Stipulation 167.] Additional trademarks include Amerimink and UMPA. Pelts with trademarks which do not belong to either GLMA or EMBA have obtained higher prices at auctions than Blackglama labeled pelts. [Trans. 10/9 at 142:18–21.]

32. Many department stores, furriers and clothing designers do not use industry-wide trademarks to market their fur products but rely on privately developed trade names. [Trans. 10/9 at 145:24–146:8.]

33. Trademarks are not the only way ranchers identify their pelts for marketing. Ranch identification in many instances is of equal importance as a guide to buyers of pelts. [Trans. 10/9 at 165:15–25.] Hudson has offered pelts for sale by ranch name. [D–65 and 66.]

34. Six or seven years ago, Hudson's parent company developed a trademark or label for its finest fur sold at its London auction house. That trademark is still used to market furs. [Trans. 10/8 at 67:12–70:5.]

35. Hudson is free to develop mink pelt trademarks, as its parent company has successfully done. Hudson in fact is developing a mark to compete with Blackglama and other marks owned by EMBA and GLMA. [Trans. 10/9 at 139:14–23.]

36. Legend establishes quality standards and guidelines for the designation of trademarks to be used in conjunction with the sale of its members' mink pelts. Among other things, Legend, together with EMBA and GLMA, ensures that a pelt sold under a trademark owned by EMBA or GLMA meets the following conditions: (1) the mink pelt was produced by a rancher who is a Legend member; (2) the mink pelt has been graded by a qualified grader acceptable to Legend; (3) the mink pelt equals or surpasses in quality specimen pelts designated by Legend guidelines; and

(4) the mink pelt is correctly classified according to Legend's instructions.

37. EMBA and GLMA each have committees to police the use of members' pelts and to enforce all of their trademark rights.

38. Neither Hudson nor any fur auction house has ever been licensed to use trademarks owned by EMBA and GLMA. Hudson has been authorized by contract to offer for sale mink pelts produced by EMBA, GLMA or Legend members which carry such a trademark.

39. While American mink ranchers are free to sell their pelts without an EMBA or GLMA trademark wherever they wish [Trans. 10/14 at 90:23–91:11], the availability of EMBA and GLMA trademarks is now restricted to pelts sold through SFX.

E. *The Industry*

40. The number of American mink ranchers is declining.

41. American ranch mink is produced on approximately 1150 mink ranches in the United States and is known by the trade to be generally of a high quality in terms of pelt color and lustre. American ranch mink is produced for the fur trade as either standard dark mink or mutation mink of various colors. [Stipulations 36 and 37.]

42. Mink pelts are not homogeneous or fungible but are diverse in color, quality, size and other characteristics. [Stipulation 48.]

43. Because mink pelts are diverse in color, quality, size and other characteristics, they cannot be bought or sold sight unseen; rather, they are sold at auction or in private sales. Value is assigned to mink pelts based primarily upon an inspection preliminary to sale to the trade through widely announced auctions conducted by auction houses.

44. When EMBA and GLMA unified, nearly 80% of the mink ranchers in the United States became members of Legend. All members of Legend are members of EMBA and GLMA. [Stipulation 11.] The balance of American mink ranchers belong

to Amerimink; in late 1986 Amerimink merged with Legend.

45. Prior to the formation of Legend, EMBA had traditionally represented ranchers who bred mutation mink of various color types, and GLMA had traditionally represented ranchers who bred standard dark mink. Ranchers who bred both types of mink could belong to either or both EMBA and GLMA. The Amerimink ranchers produce both types of mink. [Stipulation 38.]

46. There are currently three companies conducting fur auctions in the United States, Hudson, SFX and Elbeco. The number and identity of these companies have not changed since 1982. [Stipulation 56.]

47. The fur auction houses receive pelts from ranchers, grade them as to color, size and quality, and sort them into lots to achieve uniformity of color and character in each lot. [Stipulation 49.]

48. Barriers to entry into the fur auction business are low; entry into the business requires only a facility to conduct the auction, a source of financing, and personnel.

49. Since Elbeco had contracted to handle and auction only Amerimink mink, Legend members could not ship to Elbeco.

50. Ranchers customarily ship their pelts to auction houses in November and December to be ready for the first auction sales of the year in January. The January auction sales are traditionally the largest sales of the year. Many ranchers offer a substantial portion of their annual pelt crop in the January auction sales. [Stipulation 60.]

51. The auction dates for mink pelts are fixed in accordance with the time cycle for mink ranching and by agreement between the rancher organizations and the auction houses. Such dates are widely disseminated to avoid overlap with other auctions around the world.

52. The New York metropolitan area is where the largest number of fur buyers,

fur garment manufacturers and fur brokers in the United States are found. [Stipulations 135 through 138.] It has significant advantages over Seattle from both an industry and geographic point of view.

53. The rancher organizations have traditionally entered into agreements with competing auction houses, detailing the general terms by which association members ship their pelts to the auction house of their choice for grading, sorting and sale for the individual accounts of the ranchers. These agreements have also governed the use of trademarks.

54. Prior to June, 1986, mink ranchers shipped their pelts to an auction house (with which the rancher organizations had agreements concerning marketing of fur pelts) for grading, marking and sale under appropriate trademarks. Prior to June, 1986, rancher members of EMBA, GLMA and Legend were free to use, and did use, the trademarks of their rancher associations on their mink pelts at either SFX or Hudson. Subsequent to June, 1986, although the members of Legend are free to sell their pelts through any agency or auction house they so choose, the availability of the Blackglama and other trademarks at issue is restricted to pelts sold through SFX.[8]

### F. *The Relevant Market*

55. The relevant product markets are mink produced worldwide and auction houses operating worldwide.

56. Geographically, the mink business spans the globe. [P–1; P–2; P–3; P–7; P–25; P–99; D–5; D–30; Trans. 10/8 at 136:4–18.]

57. Mink is raised in, among other places, the United States, Canada, Norway, Denmark, Finland, the Soviet Union and The Peoples' Republic of China. [Stipulation 30.]

58. Worldwide production increased from approximately twenty-five million

pelts in 1981 to approximately thirty-five million mink pelts in 1985. Mink pelt production in 1985 was approximately as follows:

| | |
|---|---|
| United States | = 4.1 million pelts |
| Canada | = 1.4 million pelts |
| Scandinavia | = 14–16 million pelts |
| Soviet Union | = 11 million pelts |
| China | = 2–3 million pelts |

59. While world production was increasing from 1981 through 1985, United States production remained constant at approximately 4 million pelts per year. Accordingly, the United States' share of worldwide mink production has been on a steady decline.

60. The United States accounts for approximately one-eighth of all mink production worldwide [Stipulation 144–147, D–69–72] and of this only about one-ninth is Blackglama quality. [Trans. 10/8 at 103:16–25.]

61. In the past several years, the production of Scandinavian mink producers has increased annually by 10% to 15%. The Scandinavian producers' budget for 1986 is approximately ten million dollars. Legend's budget for 1986 is $300,000.00. [Trans. 10/14 at 198:1–8.]

62. The Scandanavian system of marketing is far better organized and more advantageous than the system used by American mink ranchers. [P–1; P–3.] The Scandanavian mink producers own their auction house and achieve economies through such an operation. Because of the efficiencies realized from the ownership and utilization of their own auction house, the Scandanavian mink producers have developed a distinct financial advantage over their American counterparts. [P–1; P–3; see also D–7.]

63. Although some mink grows wild, the overwhelming majority of mink is raised on mink ranches. The majority of domestic ranch mink is sold either at public auction or by private sales. [Stipulation

---

**8.** See Finding 5 concerning the minimum sales requirement necessary to maintain voting membership with Legend.

35.] Some mink pelts produced outside North America are marketed in the United States. Similarly, some domestic mink pelts are marketed and promoted abroad. [Stipulations 31 and 32.]

64. Some of the domestic ranch mink crop is marketed, promoted and sold outside the United States. [Stipulation 32.]

65. American mink is recognized as a product distinct from other mink products and is so promoted by Legend and was so promoted by GLMA and EMBA.

66. Scandinavian mink is more homogenous in nature than American mink.

67. The principal mink auctions are held in New York, Seattle, Toronto, London, Leningrad, Leipzig, Helsinki and Copenhagen. Some mink buyers attend mink auctions in different parts of the world. Some mink pelts raised in a particular country may be and are sold to buyers from other countries. Some mink pelts raised in a particular country may be and are shipped to other countries. Some mink pelts raised in a particular country may be and are made into garments which are sold in other countries. [Stipulations 33 and 34.] Most mink pelts are sold through these auctions and auction houses regularly compete to attract international buyers. [Trans. 10/8 at 81:16–82:2; 10/9 at 23:11–15.]

68. To accommodate the mink buyers who are located in Europe, Asia and the United States [P–99], and to maximize the number of buyers and sellers at its auctions, Hudson publishes annually a "World Fur Auctions" calendar which shows the dates and locations of fur auctions throughout the world for a given auction season. [D–6; Stipulations 57 and 58.] In fact, according to William Evans, chief executive officer of Hudson, in order for American ranchers to "compete effectively with their European counterparts in [the] rapidly-changing market," there should be only five auctions a year and all in New York. [D–53; Trans. 10/9 at 133:24–134:6.]

69. Generally, a buyer, or buying organization, will attend numerous mink auctions and buy pelts around the world, including the United States.

70. Retailers offer for sale similar quality mink garments manufactured from mink pelts produced by various worldwide mink rancher organizations at the same or similar price.

71. Garments made from mink pelts produced by various worldwide organizations are promoted and advertised together, so that a retailer, for example, may advertise jointly garments made from Canadian Majestic, Saga Select, Saga and EMBA garments which are garments produced from Canadian, Scandanavian and American pelts. [Trans. 10/8 at 62:22–63:24; 10/9 at 143:21–145:13.]

72. Garments are advertised, promoted and sold in the United States which are made from mink pelts raised outside the United States. [Trans. 10/9 at 143:21–145:13.]

73. There is substantial cross-elasticity of price in the worldwide mink pelt market. An increase in the supply of mink pelts worldwide has a definite impact on the price of mink pelts produced in the United States. [Trans. 10/8 at 136:4–18; P–25; D–30.]

74. The amount of mink sold at retail controls the price of mink. [Trans. 10/8 at 62:6–63:2.]

75. United States mink pelts have been and are available for sale in commercially significant amounts only in the United States and through fur auction houses.

76. There are no legal or contractual impediments to a domestic rancher selling his mink outside the United States.

77. Only a small quantity of domestically produced mink pelts is shipped to auction houses abroad or is otherwise sold by private treaty.

78. The quantity of mink pelts produced outside of the United States and sold through American auction firms is insignificant: less than 2% of Hudson's sales and less than 1% of Elbeco's sales are of foreign mink.

### G. Developments at Hudson

79. At approximately the time of the unification of EMBA and GLMA, Hudson was effecting changes in its operation, management and physical facilities. William Evans, from Hudson's parent company, became president and chief executive officer of Hudson and installed a new management team. [Stipulations 89, 90 and 91.]

80. In 1985 and 1986 Hudson considered relocating its auction facilities from New York to New Jersey; in the spring of 1985 Hudson commissioned two consulting reports to assist in those deliberations. [Stipulation 86.]

81. The first report was a Review of Warehouse Operations and Inventory Control Systems, and was prepared by Peat, Marwick, Mitchell & Co. in April and May of 1985. The report, which was in two phases, reviewed various aspects of Hudson's operations and made recommendations for improvement. The second report was prepared by P.A. Associates, in anticipation of Hudson's Strategic Planning Seminar held on June 13–14, 1985. The P.A. report was based, in part, on comments, submissions and information prepared by Hudson's employees. The P.A. report set forth conclusions and recommendations in various areas. [Stipulations 87 and 88.]

82. Based on these reports, Hudson determined to move its auction house from New York to a larger New Jersey facility. Hudson's New York auction facility could handle 800,000 mink pelts at a time. The New Jersey facility almost doubled that capacity. [Trans. 10/8 at 80:10–13.] Although domestic mink pelt production was not increasing, Hudson expected it could increase the number of pelts auctioned from its new facility. [Trans. 10/8 at 92:20–93:5; D–30.]

83. The New Jersey facility was an essential element of Hudson's plan to substantially increase the number of mink pelts it auctioned [D–30; Trans. 10/8 at 92:20–93:5], and was indicative of a more aggressive attitude and presence of Hudson in the industry. [Trans. 10/8 at 91:11–93:5.] It was the intent of Hudson to be the only auction house in the United States. [D–53; Trans. 10/9 at 133:24–134:6.]

84. Hudson became more responsive to the wishes of foreign buyers than to the preferences of American ranchers [Stipulation 88, Trans. 10/8 at 76:13–16] in the belief it could attract significant numbers of foreign buyers to its New Jersey facility. [Trans. 10/8 at 77:1–6; D–23.]

85. The unification of EMBA and GLMA, resulting in Legend, undermined Hudson's strategy because "[a] newly merged association [Legend] [would] not enable [Hudson] to play one side against the other as in the past." [Stipulation 88.] This is evidenced by a memorandum from Hugh Dwan, managing director of Hudson's parent company, to William Evans, dated August 29, 1985. [D–7; Trans. 10/8 at 88:23–89:7.]

### H. Hudson/Legend Business Dealings

86. Hudson's contracts with EMBA and GLMA were typically for a one year period commencing December 1. Negotiations aimed at concluding a 1986 auction contract (the "1986 Contract") between Hudson and Legend [EMBA and GLMA] began in September, 1985. The negotiations took several months to complete. [Stipulation 93.]

87. On August 29, 1985, shortly before the 1986 Contract negotiations were to begin, Dwan drafted a memorandum to Evans concerning the negotiations. [D–7.] In the memo, Dwan expressed concern, inter alia, about differences in the "Objects" clause of the existing EMBA Constitution, and Article 3 of the proposed Articles of Incorporation of what was to become Legend. The EMBA Constitution, according to Dwan, states, at the beginning of Article 3: "The purpose of the Association shall be to create a profitable demand for mink and fox pelts through advertising and promotion." Article 3 of the proposed Legend Articles states "[t]he purpose of this cooperative shall be to promote, encourage and foster the interest of mink ranchers in the

United States of America." Dwan further wrote to Evans:

We should remember that in preparing his [Haass'] paper which recommended that a merger [of EMBA and GLMA] should take place he [Haass] named as one of the assets of the US mink industry the ownership of Seattle [Fur Exchange] by a ranchers' organization which, properly supported and controlled, could become the major influence in the market.

[Stipulation 94; D–7.] Hudson was concerned SFX could develop into a major auction house with an adverse impact on Hudson.

88. On September 20, 1985, Evans met with Haass who gave him a copy of a proposed 1986 Contract. The proposed 1986 Contract was negotiated exclusively by Haass on behalf of Legend and exclusively by Evans on behalf of Hudson. [Stipulations 95 and 98.]

89. Evans wanted the 1986 Contract with Hudson to be the same as the contract Legend would have with SFX for the 1986 auction season and he also sought a contract to which all of the Legend ranchers would be signatories. [Stipulations 99 and 100.] It was Evans' intent to require the ranchers to ship their pelts to one of the auction houses with which Legend would negotiate a contract. [Stipulations 99 and 100.] It was the further intent of Evans to make Hudson that auction house. [D–53; Trans. 10/9 at 133–24–134:6.]

90. Following the meeting on September 20, 1985, further discussions and negotiations took place by telephone, mailings and a December 10, 1985 meeting between Haass and Evans. [Stipulations 101 and 102.]

91. During the course of the negotiations for the 1986 Contract, Dwan wrote a memo to Evans which stated, in part:

it is clear that whatever the earlier propaganda may have said American Legend is not seeking to build up new and better long-term relationships in the interest of the marketing of the product. Substantially it wants the old kind of antago-

nistic relationship with as many ways of screwing us into the woodwork (and out of the business) incorporated into the contract as possible.

\* \* \*

In particular under no circumstances should we accept their [Legend's] right to control, receive or approve *any* funds or deductions other than their traditional 2%. We charge *our* customers the auction fee *we* earn for what *we* do. It is no concern whatsoever of American Legend. PRESUMABLY HAASS' LONG–TERM PLAN IS TO INSURE THAT WE ARE UNABLE TO RAISE COMMISSIONS EXCEPT BY RE–NEGOTIATING THE CONTRACT. ADDITIONALLY, IF THAT WELL KNOWN SCHOOL SFX EVER MADE ANY MONEY, ITS INTEREST WOULD BE USED TO FORCE AUCTION FEES *DOWN*.

[Stipulation 103; D–9; (underlining in original; emphasis added).]

92. Hudson was concerned with the desire of Legend and its members to control their own future. Also of very major concern to Hudson was the threat of lower commission fees. In sum, Hudson was at odds with Legend concerning both the method of doing business and the price to charge for services rendered.

93. On December 20, 1985, Evans received another draft of the proposed 1986 Contract from Legend and ten days later, because of the imminence of the January sale, Evans sent Haass a telex expressing Hudson's agreement with the proposed 1986 Contract and promising to "make every effort to accelerate the finalization of the document for signature." [Stipulation 105.]

94. Evans executed the 1986 Contract, dated January 17, 1986, and returned it to Haass. On January 18, 1986, Evans sent Haass an addendum to the 1986 Contract. The president of Legend executed the 1986 Contract on behalf of Legend and Haass executed the addendum on behalf of Legend. [Stipulations 106 to 109.]

95. Agreement on the 1986 Contract between Legend and Hudson was reached only days before the January Hudson auction was to take place and after most ranchers had shipped their mink pelts to Hudson. Hudson's first auction of mink pelts for the 1986 season occurred on January 27–31, 1986 at the new facility in New Jersey.

96. Legend was concerned as to whether there would be a 1986 Contract. Legend was also concerned about the hard line, "take it or leave it" attitude demonstrated by Hudson during the 1986 Contract negotiations. These concerns were justified.

97. Following the January auction at Hudson, on February 13, 1986, Haass sent Evans a memorandum setting forth a number of the problems and difficulties experienced by Legend and its members in connection with Hudson's January 1986, auction.[9] [D-20.]

98. A number of Legend members had been dissatisfied with Hudson's performance prior to the 1986 auction season. During the 1986 auction season these problems grew worse. Legend members complained about various aspects of Hudson's 1986 auctions, including: the methods used by Hudson in grading the pelts, the grouping of pelts from various ranches into one lot, the requirement of a large minimum number of pelts for ranch lots, the use of Hudson's label for certain pelts in lieu of EMBA and GLMA designations, the insistence on presenting fur pelts in a manner contrary to rancher wishes and the non-cooperation by Hudson in a program developed by Legend to market and promote Legend members' pelts and garments made from Legend members' pelts.

99. On March 26 and 27, 1986, Legend held a Strategic Planning Session in Salt Lake City, Utah. The meeting was attended by Haass and by certain, but not all, members of Legend's Board. The Legend Board held another meeting on April 21–22,

1986 in Seattle, Washington to discuss marketing strategy. At that meeting a resolution was passed directing Haass to develop a plan for the future marketing of Legend mink. [Stipulations 112 and 115.]

100. On May 15, 1986, the Amerimink Board met with Harvey Liebergall, President of Elbeco. At that meeting, Liebergall proposed that Amerimink merge with Legend and that the newly formed association sell all its mink at Hudson's New Jersey facility. In May and June, Haass held discussions with Liebergall. [Stipulations 116 and 117.]

101. In April, 1986, Evans approached Liebergall and suggested that the two of them discuss a possible joint arrangement between Elbeco and Hudson for the sale of domestic ranch mink. This suggestion was based, in part, upon a commonly held belief that the domestic mink crop was and is insufficient to support three auction facilities in the United States. [Stipulation 118.] In May, 1986, at an industrywide fur fair in Montreal, Haass met with Evans. At that meeting, Evans suggested all domestic mink be sold at Hudson's New Jersey facility. [Stipulation 119.]

102. Toward the end of May, 1986, Evans met with Haass in Seattle and again urged Haass to consider consolidating the sale of all domestic ranch mink pelts at Hudson's New Jersey facility. [Stipulation 121.]

103. Liebergall met with Haass on June 4 and 5, 1986. During their discussions, Haass inquired whether Hudson had made any offers of merger with Elbeco. Haass told Liebergall that if he was interested in helping present the Amerimink collection through SFX, Legend would be interested in discussing that. [Stipulations 122 and 123.]

104. On June 24, 1986, Evans and Liebergall appeared before the Amerimink Board of Directors at which time Liebergall

---

9. Testimony was offered to establish the problems encountered with the January auction were corrected by Hudson. [Trans. 10/14 at 193:25—194:5.] Nevertheless, the threat of these problems remained and was a factor which the Legend Board of Directors kept in mind. See Finding 110.

suggested that Amerimink and Legend merge and sell their mink at Hudson's New Jersey facility.

105. On June 25–27, 1986, the Legend Board of Directors met in Seattle. On June 25, 1986, Evans and Liebergall appeared before the Legend Board to make a presentation. Liebergall suggested that Amerimink and Legend merge and sell their mink at Hudson's New Jersey facility. Thereafter, the meeting was devoted in part to a discussion on the future of the SFX and to an evaluation of the merits of consolidating in New York. [Stipulations 125 and 126.]

106. Hudson had withheld the 2% assessment (more than $200,000.00) due to Legend from the June, 1986 auction sales. [Trans. 10/14 at 105:3–17.] At the June 25, 1986 Legend Board meeting, Evans stated that Hudson intended to hold the money until Legend changed its warranty policy that Hudson accept Legend's pelts without a right of rejection. Hudson had no basis or authority to withhold this money. [Trans. 10/9 at 38:22–23.]

107. The Boards of Directors for Legend and Amerimink voted unanimously to unify during a series of meetings on June 25–27, 1986 and thus brought together the sources of more than 3 million American mink. [Stipulations 127 and 128.]

108. All Legend Board members, except one, had shipped some or all of their mink pelts to Hudson for the January, 1986 sale. However, the entire Board of Directors of Legend except one member committed in writing to ship their pelts to SFX in 1987. [Stipulations 129 and 131.] Moreover, the Board of Directors of Legend voted to restrict availability of the various trademarks, including the Blackglama mark, to pelts sold through SFX. However, a number of Legend members have publicly stated they will sell their mink pelts through Hudson in 1987, despite the unavailability of the Legend (EMBA and GLMA) trademarks. [Stipulation 174.]

109. The fur pelt auction dates set by SFX for the year 1987 are: January 26–31; March 23–28 and May 18–23. [Stipulation 132.]

110. The decisions of the Legend Board not to enter into a 1987 selling agreement with Hudson and to restrict the availability of the trademarks, were made in good faith, for reasons believed by the Board to be in the best interests of Legend's rancher members [Trans. 10/14 at 111:10–120:13] and to effect efficiency in the marketing and sale of its members' pelts as well as to reduce costs. These reasons included, *inter alia:*

a. Dissatisfaction with the direction Hudson's new management was taking with respect to marketing of rancher fur pelts and concern regarding Hudson's plan to consolidate all mink sales in its New Jersey facility.

b. A fear that Hudson's attempt to consolidate the sale of all North American mink pelts at its New Jersey facility would cause United States mink ranchers to lose marketing and sales control over their product.

c. The unprecedented action of Hudson withholding $200,000.00 due to Legend from the June, 1986 auction.

d. The very protracted and difficult negotiations leading up to the 1986 Contract.

e. Dissatisfaction with Hudson's conduct of its January, 1986 mink auction.

f. A belief that SFX, which is owned and controlled by the ranchers, could better fulfill the ranchers' needs and goals in connection with the sale and marketing of members' pelts.

g. A concern that market conditions could cause one or more domestic auction houses to close, and a desire to ensure that SFX, which is owned and controlled by the ranchers, survives.

h. A concern that there was not enough mink to support all domestic auction houses and that a failure to act might result in SFX going out of business.

[See generally, Trans. 10/14 at 111:10 to 120:13; P–24; P–25.]

111. Legend's trademark restriction will not prevent Hudson from holding auction sales of mink pelts. In point of fact, the parties have stipulated that "[a] number of Legend members have publicly stated that they will sell their mink pelts through Hudson in 1987." [Stipulation 174.] Hudson believes that its New York/New Jersey selling location is more attractive to buyers than is Seattle, a fact Hudson is promoting to attract both ranchers and buyers to its 1987 auctions. Hudson intends to expand its buyer incentive program for 1987, and has announced a variety of financing incentives for ranchers. Hudson intends to conduct a major mink sale in January, 1987 notwithstanding the lack of a contract with Legend.

112. Hudson was in fact concerned about its ability to compete with auction houses or other outlets which did not have the trademarks at issue. [Trans. 10/9 at 100:11–101:2.]

## II. *Discussion*

The Sherman Act was intended and designed to be a charter of economic liberty directed at preserving free and unfettered competition as the rule of trade. It is based upon the concept that the free interaction of competitive forces will result in the "best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). In this regard it was intended to sweep away significant obstructions to the policy of free trade. *United States v. Yellow Cab Co.*, 332 U.S. 218, 226, 67 S.Ct. 1560, 1564, 91 L.Ed. 2010 (1947).

In applying the Sherman Act, courts are vigilant and will not permit its salutary purpose to be invoked by business concerns seeking protection from the "rigors of competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 273 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). "[T]he Sherman Act may not be extended beyond its intended scope and used to police the morals of the marketplace." *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367, 372 (3d Cir.1985), *quoting, Sitkin Smelting & Refining Co., Inc. v. FMC Corp.*, 575 F.2d 440, 448 (3d Cir.), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). *See also Parmelee Transp. Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir.), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961) ("The antitrust laws were never meant to be a panacea for all wrongs.").

Hudson alleges Legend's restrictions on the various trademarks owned by EMBA and GLMA and policed by Legend are violative of the antitrust laws. Specifically, Hudson contends Legend violated section one by engaging in a conspiracy in restraint of trade; violated section two by monopolizing, attempting to monopolize and conspiring to monopolize interstate trade in the distribution of mink pelts; and engaged in an illegal group boycott against Hudson.[10]

### A. *Relevant Market*

Before considering the merits of Hudson's antitrust claims, the Court must first determine the relevant product and geographic markets by which to judge the alleged violations of the Sherman Act. *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391–93, 76 S.Ct. 994, 1004–06, 100 L.Ed. 1264 (1956); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 145 (3d Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d at 268.

---

**10.** Hudson has neither focused on the boycott aspect of its complaint nor argued it in its summation. The boycott contention has been effectively abandoned; and, in any event, the evidence submitted does not support the allegation. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 215–16 (D.C.Cir. 1986).

In this regard "[t]he search for 'the relevant market[s]' must be undertaken and pursued with relentless clarity." *United States v. Grinnell Corp.*, 384 U.S. 563, 587, 86 S.Ct. 1698, 1712, 16 L.Ed.2d 778 (1966) (Fortas, J. dissenting). The burden to establish the relevant markets is squarely on Hudson. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–78, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429 (D.C.Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 181, —— L.Ed.2d —— (1986); *American Bearing Co., Inc. v. Litton Industries, Inc.*, 729 F.2d 943, 949 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984). In this case little evidence and no expert testimony was offered to establish the relevant markets.

Hudson contends that "American ranch mink pelts and the business of fur auction houses in the United States are each relevant product markets, and ... the United States is a relevant geographic market." Hudson's Trial Brief at 18. The proofs submitted do not support any of the contentions. With regard to the delineation of the appropriate market for fur pelts, Hudson's witness, Harvey Liebergall, unequivocally established on cross examination that an increase in world production of mink pelts has an important impact on the prices obtained at auction or private sale for American produced fur pelts. In response to a question of whether an increase in the foreign production of mink has an impact on the price of mink produced in the United States, Liebergall testified, "[I]t has to have (sic). In fact the world market supply and demand governs everything. . . . what happens [at an auction house] in Copenhagen [and by inference at any other foreign auction house] ... when they sell dark mink ... is on everyone else's Telex" within a few hours and "it affects the marketplace". [Trans. 10/8 at 136:4–18.] As Evans and Dwan of Hudson testified, mink produced in foreign countries is advertised, promoted and sold by major fur retailers in the United States. [Trans 10/9 at 143:21–145:13; Findings 63, 67, 71, 72.]

The total number of mink garments, both foreign and domestic, sold at retail controls the price of fur pelts produced in the United States. [Findings 73 and 74; Trans. 10/8 at 62:6–63:2.] Moreover, competition in the retail markets in the United States and in foreign countries is among all fur garments, not just those garments produced from domestic pelts. [Findings 63, 64, 67–72.]

The importance of evaluating both reasonable interchangeability of use and cross-elasticity of demand of fur pelts produced in the United States and those produced in foreign countries in any delineation of the relevant product market for antitrust purposes has been established. *Brown Shoe Company*, 370 U.S. at 325, 82 S.Ct. at 1523. In this context, "... 'reasonable interchangeability of use or the cross-elasticity of demand,' determines the boundaries of a product market." *Grinnell Corp.*, 384 U.S. at 592–93, 86 S.Ct. at 1714–15 (Fortas, J., dissenting). In determining the cross-elasticity of demand and interchangeability of use among various mink products, the responsiveness of the sales of one product to price changes or indeed supply of another must be weighed. *See, Smithkline Corp.*, 427 F.Supp. at 1115.

■ The availability of supply from various suppliers is a restraint on any producer of an item, in this case fur pelts, from increasing prices above the competitive level. Accordingly, as mentioned, the definition of a relevant market is based upon a determination of available substitutes.

To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price or volume.

L. Sullivan, *Handbook of the Law of Antitrust* § 12 at 41 (1977); *see also E.I. duPont de Nemours & Co.*, 351 U.S. at 395, 76 S.Ct. at 1007. To measure the cross-

elasticity of demand is to determine whether a similar product will be substituted for the product in question. Likewise, cross-elasticity of supply is based upon the capability of other production facilities to produce a substitute product. The likelihood that similar products or production facilities are to be included in a relevant market increases in direct proportion to the increase of cross-elasticity or interchangeability of use of these products or facilities.

■ In *Brown Shoe*, the Supreme Court spoke of the concept of submarkets within a relevant market. The Court identified "practical indicia" for delineation of submarkets. Such indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes and specialized vendors." *Brown Shoe Co.*, 370 U.S. at 325, 82 S.Ct. at 1523. In this case, under no accepted definition of submarkets has Hudson produced evidence to establish a submarket either in dark mink (the type which would qualify for the Blackglama label) or in only auction houses located in the United States.

The statements of Liebergall, Evans and Dwan demonstrate that prices for American produced mink pelts are directly affected by foreign production. As well, the interchangeability of use and desirability of American produced pelts are affected by foreign production. Competition from foreign sources is strong. [Findings 67–72.]

Another consideration is the market share American produced pelts occupy within the product market. While worldwide fur pelt production rose from approximately twenty-eight million pelts in 1982 to approximately thirty-five million pelts in 1985, American production remained at slightly in excess of four million pelts per year for the same period. [Findings 58 and 59.] Accordingly, the percentage of American produced furs has steadily declined from slightly more than one-seventh of the worldwide production in 1982 to slightly more than one-eighth of worldwide produc-

tion in 1985 [Findings 58 and 59], and of this amount, only one-ninth is Blackglama quality. [Findings 26 and 60.] This is hardly a market share sufficient to control prices or supply; it does not equate to monopoly power in this market. *See E.I. du Pont de Nemours & Co.*, 351 U.S. at 394, 76 S.Ct. at 1007; *Reinforced Earth Co.*, 786 F.2d at 428; *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1080 (3d Cir.1978); *Pennsylvania Dental Ass'n v. Medical Service Ass'n*, 574 F.Supp. 457, 472 (M.D.Pa.1983), *aff'd*, 745 F.2d 248 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985); *Robinson v. Magovern*, 521 F.Supp. 842, 891 (W.D.Pa.1981); 3 P. Areeda & D. Turner, *Antitrust Law* § 835c at 350 (1978). Even if it is assumed the relevant product market is limited to pelts produced in the United States, only one-ninth of that total is of Blackglama quality which does not translate into market power.

■ With regard to the Blackglama trademark and its availability to only those pelts produced in the United States (and now sold through SFX), it makes no sense to say the product market is only domestically produced pelts and therefore Legend has monopoly power because of such a market definition. *See Reinforced Earth Co.*, 786 F.2d at 429. The market cannot be limited, in this situation, to a product eligible for a trademark which is subject to the impact of cross-elasticity and interchangeability of use of products which are ineligible for the trademark. A limitation such as this "arbitrarily circumscribe[s] and exaggerates" Hudson's position. *Id.* at 430. Accordingly, based upon the findings in this matter, the argument of Hudson to limit the relevant product market to American produced fur pelts is rejected.

Hudson's contention that another relevant product market for consideration in this case is the business of fur auction houses in the United States is also rejected for the same reason. If, as Hudson argues, a definition of the relevant market "turn[s] on discovering patterns of trade which are followed in practice, *United*

*States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 303 (D.Mass.1953); *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954)" (Hudson Trial Brief at 18), its own witnesses have established that even if particular pelts are not fungible [Findings 42 and 65], there is a clear cross-elasticity of demand and a reasonable interchangeability among fur pelts produced in the United States and in foreign countries [Findings 67 to 74] and this, together with industry practice, leads to the conclusion that the product markets (fur pelt market and auction house market) are worldwide markets. [Findings 67 to 74.]

The parties themselves regard the geographic scope of the markets as worldwide. [P–1, P–7, P–25, P–99, D–30]. The 1985 annual report for the Hudson Bay Company, parent of Hudson, notes "[o]verall, the fur market suffers from a sluggish retail market—with notable exception of the United States—and an over-production of mink, particularly in the Scandinavian countries. There is some evidence that the present price structure is stimulating activity in traditional markets such as West Germany...." [D–30 at 12.] Significantly, this comment refers to the market in the singular and includes several European countries with the United States in the market.

A document prepared for Legend's strategic planning discussion of May 26 and 27, 1986 noted "American mink is losing ground in the world marketplace." [P–7.] Likewise, a newsletter from Legend and a letter from the president of Legend refer to the goal of building SFX into "the most successful marketing and auction organization in the world" [P–24] and note that "[i]t is clear that in the world marketplace today, the American mink rancher must be represented by a single association in order to have the necessary impact on the rest of the world." [P–25.] Additionally, the competition is international in nature. American produced mink directly competes with mink produced abroad. Mink auctions are held throughout the world and are attended by buyers from throughout the world. Schedules are constructed to avoid overlap of auctions and calendars are prepared to notify all buyers of the dates and locations of the various auctions worldwide.

The American mink ranchers have a worldwide market for their pelts [Findings 67 to 74] and are not required to use either Hudson or SFX in order to access the market. It is untenable to argue the market is limited as proposed by Hudson. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 487–89 (5th Cir. 1984). Hudson's arguments to restrict the relevant markets for consideration in this case to the United States are unsupported by the evidence. The part of commerce or "relevant market" in which the conduct described herein operates is the worldwide market. This determination concerning the relevant markets is sufficient to dispose of this matter. *See Reinforced Earth Co.,* 786 F.2d at 428–30. Nevertheless, I shall address other issues raised by Hudson.

### B. *Sections One and Two*

Hudson claims Legend violated section one of the Sherman Act by unlawfully restricting the availability of Legend's trademarks to only those pelts sold through SFX. Section one of the Sherman Act forbids contracts, combinations or conspiracies in restraint of trade. However, the prohibition of section one applies only to conduct by two or more persons or entities. Addressing the possibility that a single entity may also stifle competition, section two of the Sherman Act makes it unlawful to "'monopolize, or attempt to monopolize ...' any part of interstate or foreign commerce." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d at 272.

Although section one of the Sherman Act literally bars any combination of persons or entities "in restraint of trade," *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 606, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), courts have interpreted the word "every" liberally and construe section one as precluding only

those contracts or combinations which "unreasonably restrain competition." *Northern Pacific Railway*, 356 U.S. at 5, 78 S.Ct. at 518; *United States v. Columbia Steel Co.*, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948); *United States v. Joint Traffic Ass'n*, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898). Accordingly, since *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), the Supreme Court has analyzed most restraints under the so-called "rule of reason," which requires a determination as to whether, under all the circumstances of the case, the restrictive practice imposes an unreasonable restraint on competition. *See Maricopa County Medical Soc'y*, 457 U.S. at 343, 102 S.Ct. at 2472.

■ To prevail in a section one case there must be proof of more than solitary conduct; there must be proof of concerted action. *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 893 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). *See also Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981): "Unilateral action, no matter what its motivation, cannot violate § 1. ... The evidence must permit the inference that the alleged conspirators 'had a unity of purpose or a common design and understanding, or a meeting of the minds.'" (citations omitted).

Consistent with precedent applying the rule of reason analysis, Hudson must show both the existence of a "contract, combination ... or conspiracy," and an unreasonable restraint in the appropriate product and geographic markets to successfully carry its burden under section one. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 597 F.Supp. 217, 225 (D.D.C. 1984), *aff'd*, 792 F.2d 210 (D.C.Cir.1986).

The matter presently before this court does not present a scenario as confronted the Court in either *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) or *United States v. Sealy, Inc.*, 388 U.S. 350, 87 S.Ct.

1847, 18 L.Ed.2d 1238 (1967). In *NCAA*, member institutions, by their participation in an association which prevented them from competing against each other on the basis of price or kind of television rights that could be offered to broadcasters, created a horizontal restraint—an agreement among competitors on the way in which they would compete with one another.

In *Sealy*, manufacturers of mattresses were licensed by Sealy to produce and sell products using the Sealy trademark. Sealy was owned almost entirely by its licensees who elected the board of directors and in fact controlled the business. Sealy agreed with its licensees not to license other manufacturers or sellers to sell Sealy-brand products in allocated territories in exchange for the promise of each licensee who sold in that territory not to expand beyond the area designated by Sealy. This was held to be a horizontal restraint, a *per se* violation of the Sherman Act. *See also Topco Associates*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515.

Unlike the situation in *NCAA* or *Sealy*, the members of the Board of Directors of Legend, although they are competitors among themselves with regard to the sale of their fur pelts, are not in competition among themselves or with Legend or SFX concerning the actual conduct of the auction sales of their mink pelts. As such, competition among the ranchers or Legend or SFX does not run the risk of elimination or even reduction by the restriction on the availability of the trademarks. The situation presented to the Court by Hudson is in many respects the mirror image of that presented to the Court in *Sealy*. In point of fact, the restriction of the trademark, an ancillary restraint, is the result of attempts to enhance the efficiency of the marketing of the fur pelts which belong to the members of Legend. *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

■ *Addyston Pipe* recognized a *per se* rule of illegality for "naked" price fixing or market-dividing arrangements but further

noted a *per se* rule is not practicable for all integrations of economic activity. The *Addyston Pipe* decision recognized that agreements which may eliminate or reduce rivalries within an enterprise as a means of enhancing a firm's or business' efficiency are ancillary and accordingly subordinate and collateral to the main purpose of integrations of economic activities. In this regard Judge (later Chief Justice) William Howard Taft gave the example of a partnership and explained the reasons for the validity of an agreement "by a partner pending the partnership not to do anything to interfere, by competition or otherwise, with the business of the firm":

> [W]hen two men became partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union of their capital, enterprise, and energy to carry on a successful business, and one useful to the community. Restrictions in the articles of partnership upon the business activity of the members, with a view of securing their entire effort in the common enterprise, were, of course, only ancillary to the main end of the union and, were to be encouraged.

*Id.,* 280, 281. Without doubt, however, the restraint imposed must have a logical nexus to the efficiencies sought to be achieved and must be appropriately circumscribed to achieve the efficiency sought. If the restraints, even though they are ancillary, are part of a general plan to monopolize a market, they are illegal. *Id.* at 282–83.

■ The Legend restraints are part of an overall plan to effect efficiencies in the method of distributing fur pelts produced by Legend's members. These efforts are in direct response to competition from world markets and in particular to the Scandinavian system of marketing fur pelts. The efforts by Legend to compete in the world market include not only efforts at effective use of SFX, but also more effective marketing techniques including better utilization of its trademarks. In reviewing the intent of the Board of Directors of Legend as revealed in documents and testimony (see, e.g., P–1, P–7, P–24,

P–25, P–99; Trans. 10/14 at 111:10–120:13), I find the challenged restraint to be ancillary to the overall plan of Legend to become more competitive in that it is part of a system to enhance efficiencies in marketing and distributing fur pelts. Given the breadth of the product and geographic markets and the limited impact which Legend could have on these markets, it cannot be said the restraint is part of a plan to gain monopoly control over the market.

■ Even were this to be found to be an unreasonable restraint of trade for purposes of a section one analysis, I am not satisfied Hudson has demonstrated the existence of concerted action, that is action which is more than unilateral in nature with regard to the imposition of the restraint concerning the availability of the trademark. Since SFX is the wholly owned subsidiary of Legend, the coordinated activity of Legend and SFX must be viewed as that of a single enterprise for purposes of section one of the Sherman Act. "A parent and its wholly owned subsidiary have a complete unity of interest. ... Indeed, the very notion of an 'agreement' in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984).

A more interesting issue is presented with regard to the Directors of Legend who voted for the restriction and/or the various rancher members of Legend, all of whom are competitors among themselves but none of whom have been demonstrated to have an "independent personal stake" in this matter. *See Greenville Publishing Co., Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974). Such a separate interest in adopting a policy with the restraints as indicated, could constitute an exception to the rule that a corporation cannot conspire with its own officers. However, the unity of interest among the corporation, Legend, and its Board of Directors is obvious—enhanced efficiencies in the marketing and distribution of their fur

products. There is a marked absence of any indication to suggest that the adoption or maintenance of this new policy would restrict competition or control the market as was evident in *Sealy*. Accordingly, Hudson has not demonstrated the existence of a "contract, combination ... or conspiracy" in restraint of trade.

Hudson also argues the trademark restriction is a violation of section two of the Sherman Act in that such an arrangement is an unlawful tying arrangement—i.e. that Legend is using its valuable trademarks to coerce ranchers to sell pelts through SFX. The antitrust concern behind Hudson's claim is two-fold: first, that competition among pelt distributors in attracting sellers of pelts will be adversely affected by factors other than the quality and/or attractiveness of the services provided by the distributors; and second, that mink ranchers will not base their decisions as to where to sell their pelts on a neutral assessment of the merits of the competing pelt distributors.

Although Legend's membership comprises almost all American mink ranchers, Legend does not have the ability nor has Hudson demonstrated that Legend has the intent to force or require its members to sell their pelts through SFX. [Findings 5, 12–19, 22, 52–74, 79–110.]

Hudson contends the restrictions on the availability of Legend's trademarks, including the Blackglama label, will force a shift of fur pelts from Hudson to SFX. However, Hudson did not produce evidence to establish the anticipated shift from Hudson to SFX will occur because of the restricted label availability. Nor do I draw such an inference from the evidence presented.

Although the Blackglama label is valuable as well as desirable to American ranchers, it applies to only one-ninth of the American produced fur pelts. [Finding 26.] No evidence was offered to demonstrate what percentage of the approximately one and one-half million pelts which are expected to shift from Hudson to SFX [Trans. 10/9 at 59:6–25] would qualify for the Blackglama label. Moreover, it seems such information is available since Hudson offered evidence that twenty of the twenty-two top bundles (furs which obtained the highest prices in their respective categories) were sold through Hudson in 1986. [Trans. 10/9 at 79:22—80:18.] This type of data if proffered with regard to prior Blackglama sales could establish an adequate basis from which to extrapolate and project the so-called Blackglama loss to Hudson in 1987.

There are several reasons why a large portion of the pelts eligible for the Blackglama label might commit to Hudson for the 1987 auction despite the unavailability of the Blackglama mark: (1) Hudson's location has significant advantages over SFX from a marketing point of view [Finding 52]; (2) some buyers purchase pelts according to the ranch rather than the label [Finding 33]; (3) some ranchers sell under their own trade names and do not use the Blackglama label [Findings 31 and 33]; and (4) Hudson is developing its own trademarks to compete with the Blackglama mark [Findings 34 and 35]. Hudson failed to submit significant evidence to show United States mink ranchers intended to sell their pelts through SFX because of Legend's decision.[11] Indeed, the parties stipulated that numerous Legend ranchers

11. Plaintiff submitted exhibits P–84 to P–87 to demonstrate the ranchers were and "... are being coerced into dealing with SFX to the exclusion of Hudson...." Interim Trial Memorandum on behalf of Hudson at 3. Legend objected to this proffer because of lack of authentication, hearsay and relevancy. Legend's Brief in Opposition.

These documents are admissible under Fed.R. Evid. 803(3); Legend's arguments are not sufficient to prevent admissibility. However, the weight to be accorded to these documents, as well as P–107—P–114, is slight. I note the wording of P–84 and P–107—P–114 is, in pertinent part, identical suggesting an orchestrated effort. Moreover, the thrust of the complaints is inaccurate. For example, P–85 expresses the wish of the Iowa Fur Farmers to be able to market their fur pelts at whatever auction house they choose. This is incorrect; the Legend restriction concerns only the availability of the trademarks. In substance, these documents do not establish coercion as alleged by Hudson.

intend to sell their pelts through Hudson despite the Legend trademark restriction. [Finding 111.] Apparently these ranchers are sufficiently satisfied with Hudson's services, undeterred by the unavailability of Legend trademarks and attracted by Hudson's proximity to the major New York market, to sell their pelts through Hudson. Simply stated, Hudson has not carried its burden to establish that the restriction on the availability of the trademarks has forced or will force a shift from it to SFX.

■ The Supreme Court has developed a fairly structured analysis of the workings of an allegedly unlawful tying arrangement for courts to follow in determining whether the arrangement violates the Sherman Act. Whether fashioned as a *"per se"* or "rule of reason" analysis, the law is clear Hudson may prevail on its claim if it can show (1) Legend has sufficient "market power" in the tying product market to appreciably restrain trade in the tied product market, and (2) a substantial volume of interstate commerce in the tied product market is foreclosed. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 13–14, 16, 104 S.Ct. 1551, 1558–59, 1560, 80 L.Ed.2d 2 (1984). Even if Hudson fails to prevail on these claims, it may still establish a violation by showing the Legend restriction unreasonably restrained competition in the tied product market. *Id.* at 29, 104 S.Ct. at 1567. Because Hudson has failed to carry its burden on any of these points, Hudson has not established an unlawful tying arrangement in violation of the Sherman Act.

First, Hudson has failed to prove that Legend's tying product—the assertedly valuable Legend trademarks—exercises the requisite market power in the market in which it competes, the worldwide mink pelt market. Courts have recognized this requisite market power in several situations. One is where the tying product is distinctly unique and thus particularly desirable to buyers in that market. *See, e.g., United States v. Loew's Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962) ("Even absent a showing of market dom-

inance, the crucial economic power may be inferred from the product's desirability to consumers or from uniqueness in its attributes."); *Northern Pacific Railway Co.,* 356 U.S. at 7, 78 S.Ct. at 519 (tying product, land, "was often prized ... and was frequently essential" to buyers in the market). A second context in which courts have recognized the requisite market power is where the tying product exhibits significant economic power in the market in which it competes. *See, e.g., Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969). A third situation in which the requisite market power can be found is where the tying product enjoys a high share of the relevant market. *See, e.g., Jefferson Parish,* 466 U.S. at 17, 104 S.Ct. at 1560; *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 611–13, 73 S.Ct. 872, 881–83, 97 L.Ed. 1277 (1953).

Hudson has not demonstrated that Legend's trademarks possess any of these "market power" attributes. As an initial matter, Hudson has not, and indeed could not have, proved the Legend trademarks to be unique. Hudson is entirely free to develop a trademark for marketing high quality mink pelts to compete for rancher's pelts with Legend's trademarks, and Hudson is developing such a mark. [Finding 35.] In fact, Hudson's parent has developed an effective trademark for premium furs sold in its London auction house. [Finding 34.] Moreover, retailers use many labels other than Legend's Blackglama mark to market premium quality fur garments. [Finding 32.] In addition, ranchers use various labels other than Legend's Blackglama mark to market their premium pelts. [Finding 31.] *Compare Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 664 n. 4 (2d Cir.1974) ("the presence of the trademark does not at all prevent a competitor from duplicating the distinctive features of the allegedly tying product") with *Digidyne Corp. v. Data Gen'l Corp.,* 734 F.2d 1336, 1341 (9th Cir.1984) (tying product's "copyright established both the distinctiveness of

[the tying product] and a legal bar to its reproduction by competitors"). *See also United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 622, 97 S.Ct. 861, 868, 51 L.Ed.2d 80 (1977) ("In other words, the plaintiff must show a barrier to entry that prevents competition. If rivals may design and offer a similar package for a similar cost, there is no barrier, and without a barrier there is no market power."). [See Findings 31–35 and 48.]

In addition, it has been noted that the Blackglama label is not as strong in the world market as it once may have been, and mink produced in the United States is not competing well in the world market. [P-7.] This, together with the stiff competition from the Scandinavians, demonstrates the fact that the Blackglama label is not unique. Significantly, Hudson is concerned about its ability to compete with auction houses or other outlets which did *not* have the availability of the trademark. [Trans. 10/9 at 100:11—101:2.]

Hudson did not attempt to suggest Legend's trademarks encompass a "dominant" share of the worldwide mink pelt market. Legend's Blackglama trademark applies to approximately one-ninth of all mink pelts produced in the United States; the United States accounts for approximately one-eighth of worldwide mink pelt production. [Findings 26 and 60.] Hudson does not argue that such percentages provide "market dominance" to support a finding of the requisite market power. Even if Hudson had shown that Legend's tying product enjoyed the market power required for an illegal tie, Hudson failed to submit proof that a substantial volume of commerce in the tied product market would be foreclosed thereby. *Jefferson Parish*, 466 U.S. at 16, 104 S.Ct. at 1560.

 Finally, Hudson did not submit evidence to establish the Legend trademark restriction will unreasonably restrain competition in the pelt distribution market. A court must consider several factors in determining whether an alleged economic re-

straint is procompetitive or suppresses competition. Included among such factors are: (1) the history of the business and its industry; (2) the alleged economic restraint and its impact on the business and industry; (3) the reason, purpose and intent for adopting the alleged economic restraint; (4) the effect of the alleged economic restraint; and (5) the condition of the business and industry prior and subsequent to the imposition of the alleged economic restraint. Assessment of these factors facilitates the balancing of procompetitive and anticompetitive consequences of an alleged restraint. *See Maricopa County Medical Society*, 457 U.S. at 343 n. 13, 102 S.Ct. at 2472 n. 13, *citing, Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

An examination of these factors in the case at bar leads to the conclusion that Legend's trademark restriction does not impose an unreasonable restraint on competition. The history surrounding the fur pelt business establishes that there have been only a few auction houses in recent years [Finding 8], the main auction house competitors are SFX and Hudson, the portion of American produced mink has been declining, although the Blackglama label is desirable and valuable an auction house can compete without its availability, Hudson has distinct advantages over SFX [Findings 52 and 111], Hudson's parent has developed an effective trademark for premium furs sold in its London auction house [Finding 34], prior to this litigation the trademarks were available only by contract [Findings 49, 53 and 54], Hudson is developing a trademark to compete with the Blackglama mark [Finding 35], retailers use many labels other than Blackglama to market premium quality fur garments [Finding 32], ranchers use labels other than Blackglama to market their premium pelts [Finding 31], the supply and price of foreign produced fur pelts directly affects the price of American produced fur pelts [Findings 67 to 74] and the reason, purpose and

intent for the restraint are all justified by business considerations.[12]

Hudson has not demonstrated the economic restraint or its impact on its business in particular or the industry in general. Specifically, while Hudson has shown SFX expects an increase from one million three hundred thousand to approximately three million pelts in 1987, Hudson has not shown this is due totally or in significant part to the trademark restriction. Nor has Hudson shown the restriction will enable Legend to control supply or pricing of fur pelts or prevent Hudson from competing with SFX.

The testimony of Robert Haska, a rancher offered by Hudson, does not establish coercion and a resultant forcing of ranchers to use SFX.[13] Although evidence was offered to support the conclusion that the shift from Hudson to SFX is inevitable for no reason other than the trademark restriction [Trans. 10/14 at 134:10—135:17; 146:6–17; 160:1–18], a contrary inference, that SFX is attractive for other reasons, can be and is drawn. SFX offers its members, the American mink ranchers, the opportunity to (1) compete on a par with some of the foreign producers, (2) increase the value of an asset—the auction house— which they own, and (3) reduce costs. Because competition in this arena is not inevitably dependent on the availability of the Legend trademarks, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985); *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912),[14] I find Hudson has failed to prove an impact of the restraint on either the geographic or product market or competition in those markets.

Although the present status of the law may be in transition, even under the decision in *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 173–74, 68 S.Ct. 915, 936–37, 92 L.Ed. 1260 (1948), the legality of such vertical integration pivots upon the purpose or intent with which it was created and its consequential power and purpose or intent. It must be determined then whether the restrictions on the availability of Legend's trademarks and attempted efficiencies were designed (1) to gain control over an appreciable segment of the market or restrain or suppress competition, or (2) to respond to a legitimate business need of the members of Legend— the American mink ranchers. The focus is on "the importance of characterizing the nature of the market to be served, and the leverage on the market which the particular vertical integration creates or makes possible"[15] as well as the "purpose or intent with which the combination was conceived." *Columbia Steel Co.,* 334 U.S. at 524–25, 68 S.Ct. at 1122–23.

The "purpose or intent" of the Board of Directors of Legend with regard to its marketing decision to restrict the availability of its trademarks is apparent from the following: (1) Legend's concern that SFX survive in light of a limited number of fur pelts; (2) Legend's concern with Hudson's consolidation plan to conduct all mink auction sales at its New Jersey facility [Findings 80, 82 and 83]; (3) the extended negotiations, Hudson's demands (e.g. contract to be signed by all ranchers) and delays in reaching a contract for the 1986 auction season

---

**12.** See pages 843 to 44 for an explanation of the business purpose and intent with regard to the adoption of the restriction on the availability of the trademarks.

**13.** Nor does the other evidence submitted by Hudson establish coercion. See footnote 11.

**14.** In *Aspen Skiing,* defendant, a competitor with monopoly power changed its ski lift ticket policies which rendered plaintiff's ski facility substantially less desirable to consumers. These circumstances are not present in this case. Legend does not have monopoly power

nor has it been proved that pelts without the trademark are less desirable, *per se.* The trademark is simply not an essential facility. Denial of access to the Blackglama trademark (or any other trademark at issue) will not give Legend exclusive control of all practical means of competition or the power to exclude or reduce competition in violation of the Sherman Act. *See also Terminal R.R. Ass'n, supra.*

**15.** As indicated, Hudson has not proved a market limited enough to permit the inference that Legend has leverage in such market.

[Finding 86 to 96]; (4) the problems encountered by the ranchers leading up to and during the January, 1986 auction at Hudson; (5) the unprecedented and unilateral withholding of the $200,000.00 assessment from the June, 1986 auction, collected by Hudson and payable to Legend [Finding 106]; (6) the realization Hudson could exercise the power to withhold money at any time to force its ways on the ranchers; and (7) the realization of the significance of SFX and the opportunity to use SFX to establish independence, reduce costs and effectively market their product. [P-1, P-7, P-24, P-25.]

■ In *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (1985), the court found that defendant's actions were not designed to exclude distributor competition or fix prices. The actions were implemented to advance the business interests of the parties. Although the arrangement adversely affected plaintiff's business, it was insufficient to prove an unlawful intent to restrain trade. Because there was no *per se* violation, the court also found that Seaboard failed to show an anticompetitive effect in the relevant product and geographic market. *Id.* at 374. A unilateral decision to rearrange a distribution structure by limiting or increasing the number of dealers or transferring business to different dealers does not violate the Sherman Act. *Id.; See also Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir. 1972). However, if such a "decision was the result of pressure from a retailer-competitor of the plaintiff, the restraint [would be] horizontal and a per se violation." *Congoleum Corp.*, 770 F.2d at 374; *see also Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 167-68 (3d Cir.1979).

■ In this situation the restriction on the availability of the trademark is not an unlawful vertical integration. Hudson has proved neither an intent nor a purpose to restrain or suppress or eliminate competition, nor has it proved the restraint is the result of pressure from a competitor of Hudson. Because the relevant market is comprised of both foreign and American produced pelts [Findings 55, 56 and 67 to 74], the leverage or power of Legend because of its trademark restrictions is insignificant, if at all existent. Hudson has not demonstrated, nor can it be said, Legend has leverage in the market to control prices or supply or to eliminate competition at any level. Moreover, the requisite intent or purpose to exercise such power, if it exists, has not been demonstrated.

■ A manufacturer may control the marketing of its own product, and, as long as it acts unilaterally, may do so even though it harms its competitors. *See Aspen Skiing Co.*, 472 U.S. at 599–602, 105 S.Ct. at 2856–57 (a firm has "no general duty to engage in a joint marketing program with a competitor"); *Cernuto Inc.*, 595 F.2d at 167 ("a manufacturer may sell its product to whomever it wishes, and a unilateral refusal to deal has not been considered to be a violation of the Act").

■ Section two of the Sherman Act condemns monopolization, attempts to monopolize, or combinations or conspiracies "to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. Monopoly power has been defined as the power to control prices or exclude competition. *Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704; *E.I. du Pont de Nemours & Co.*, 351 U.S. at 391, 76 S.Ct. at 1004; *Fleer Corp.*, 658 F.2d at 154; *Smithkline Corp.*, 427 F.Supp. at 1114–15. The power "to exclude competition when it is desired to do so" is only a violation if coupled with the purpose or intent to exercise that power. *See American Tobacco Co. v. United States*, 328 U.S. 781, 809, 811, 814, 66 S.Ct. 1125, 1138, 1139, 1141, 90 L.Ed. 1575 (1946).

In evaluating an alleged violation of section two, courts focus on two necessary elements: first, the possession of monopoly power and second, the willful acquisition or maintenance of such power separate and apart from growth or development as a result of a superior product or business acumen. *See Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704; *Berkey Photo, Inc. v.*

*Eastman Kodak Co.*, 603 F.2d a 274; *Smithkline Corp.*, 427 F.Supp. at 1114; R. Bork, *The Antitrust Parodox* 172 (1978). Accordingly, to establish an offense under section two, Hudson must demonstrate that Legend unfairly attained or maintained the power to control prices or exclude competition in the relevant market or has attempted to do so.

█ Hudson's section two argument assumes a relevant product market defined by American mink or American fur auction houses, and the relevant geographic market to be limited to the United States. As discussed earlier, however, these definitions are rejected; the appropriate relevant product and geographic markets are worldwide. Even if Legend can be said to have control over the sale of American fur pelts, what is at issue—presently about one-eighth of the worldwide production [Finding 60], of which approximately less than one-ninth is qualified for the Blackglama label [Finding 26]—is hardly monopoly power. In short, Legend has no ability to control prices or supply or competition. This is especially evident from the fact that prices are set by auctions attended by buyers from around the world. [Findings 67 to 69.]

Assuming, again *arguendo*, Legend's monopoly power in the United States markets had been established, Hudson's section two argument still fails. Hudson does not claim the possession of this monopoly power by itself is unlawful (Plaintiff's Trial Brief at 25), but argues Legend's trademark restrictions constitute an unlawful attempt to gain a competitive advantage in the fur auction business. "Specific intent to monopolize the relevant market is a necessary element of conspiracy to monopolize." *Fleer Corp.*, 658 F.2d at 153; *accord, Times-Picayune Publishing Co.*, 345 U.S. at 626, 73 S.Ct. at 890; *Carpet Seaming Tape Licensing Corp. v. Best Seam Inc.*, 616 F.2d 1133, 1141 (9th Cir.1980), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983); *V. & L. Cicione, Inc. v.*

*C. Schmidt & Sons, Inc.*, 403 F.Supp. 643, 651 (E.D.Pa.1975), *aff'd*, 565 F.2d 154 (3d Cir.1977).

Hudson has failed to show that Legend's intent or purpose was to maintain or exercise its market power, a necessary element to establish a section two violation. *See American Tobacco Co.* 328 U.S. at 809, 811, 814, 66 S.Ct. at 1138, 1139, 1141. Thus, consideration of the commercial realities in the marketplace, *Brown Shoe Co.*, 370 U.S. at 336, 82 S.Ct. at 1529; *Smithkline Corp.*, 427 F.Supp. at 1116–18, leads to the conclusion that regardless of whether the competition between Hudson and SFX is fair,[16] Legend is not in violation of the antitrust laws.

III. *Conclusions of Law*

1. This Court has jurisdiction over the parties and subject matter of this action under section fifteen of the Clayton Antitrust Act (15 U.S.C. § 15) and sections one and two of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2).

2. Both parties to this action are engaged in interstate commerce in the auction sales of mink fur pelts. The actions of Hudson and Legend, described herein, affect interstate commerce within the meaning of the Sherman Act.

3. The relevant markets affected by the conduct described herein are the production of fur pelts throughout the world and the auction distributors located in the United States, Europe, Asia and Soviet Union. The relevant geographic market is worldwide.

4. Legend and SFX are a single legal entity for purposes of the antitrust laws; any agreement between Legend and SFX does not, as a matter of law, constitute a conspiracy.

5. Legend and its member ranchers have not entered into any agreement which violates the Sherman Act.

16. As noted in footnote 3, Hudson's claims concerning interference with contractual relationships and economic advantage were dismissed with its consent at the end of its case.

6. Legend, EMBA and GLMA have not entered into any agreement which violates the Sherman Act.

7. Legend's decision not to enter into a contract with Hudson for the 1987 auction season does not constitute a contract, combination or conspiracy in restraint of trade within the meaning of section one of the Sherman Act, 15 U.S.C. § 1.

8. Legend's decision to make the EMBA and GLMA trademarks available for use only on member pelts sold at SFX during the 1987 auction season does not constitute a contract, combination or conspiracy in restraint of trade within the meaning of section one of the Sherman Act, 15 U.S.C. § 1.

9. Legend's decision not to enter into a contract with Hudson for the 1987 auction season does not constitute monopolization, attempted monopolization or conspiracy to monopolize within the meaning of section two of the Sherman Act, 15 U.S.C. § 2.

10. Legend's decision to make the EMBA and GLMA trademarks available for use only on member pelts sold at SFX during the 1987 auction season does not constitute monopolization, attempted monopolization, or conspiracy to monopolize within the meaning of section two of the Sherman Act, 15 U.S.C. § 2.

11. Legend's decision to make the EMBA and GLMA trademarks available for use only on member pelts sold at SFX during the 1987 auction season does not constitute an unlawful tying arrangement within the meaning of section one of the Sherman Act, 15 U.S.C. § 1.

12. Legend does not possess monopoly power in either the relevant product markets or geographic market.

13. Legend, by linking its trademarks to the use of SFX's auction services, has not used its trademark to foreclose, exclude or reduce competition in the relevant markets.

14. Hudson has not carried its burden to establish Legend monopolized or sought to monopolize the relevant product or geographic market.

15. Any Finding of Fact which should be deemed a Conclusion of Law is incorporated herein by reference.

16. For the foregoing reasons, the relief requested by Hudson in its complaint is denied in its entirety, no injunctive relief will be granted. This matter is dismissed with prejudice and with costs to Legend.